Ex Parte James S. MASONHEIMER, Appellee.

No. PD–521–05.

Court of Criminal Appeals of Texas.

March 21, 2007.

Rehearing Denied May 2, 2007.

Colby D. Smith, Fort Worth, for Appellant.

Patricia K. Dyer, Asst. D.A., Abilene, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which MEYERS, PRICE, JOHNSON, KEASLER, and HOLCOMB, JJ., joined.

Almost six years ago, appellee was charged with murder. The State seeks to try him a third time after the first two proceedings were terminated prior to final judgment at appellee's request. Viewed in the light most favorable to the trial court's ruling, the evidence supports a finding that appellee's mistrial motions, which resulted in the termination of the first two proceedings prior to verdict, were provoked primarily by the State's intentional failure to disclose exculpatory evidence [1] with the specific intent to avoid an acquittal at the first proceeding. Appellee did not discover all of the undisclosed exculpatory evidence until the second proceeding. We hold that, under the unique facts of this case, a third prosecution is jeopardy-barred under the state and federal constitutions.

In September 2001, appellee was indicted for murdering his daughter Lucy's boyfriend. Appellee claimed that he killed the victim in self-defense and in defense of Lucy. The Court of Appeals' opinion summarizes the evidence that appellee intended to present at his first trial in support of these defenses:

During a pretrial hearing before the first trial, [appellee's] attorneys advised

---

1. The trial court found that the State should have disclosed this evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), before appellee's first trial. The issue of whether the undisclosed evidence meets *Brady* is not before the Court because this issue was not raised as a ground on discretionary review. This opinion, therefore, assumes without deciding that the undisclosed evidence meets *Brady*. We do note that the defense, the State, the trial court and the Court of Appeals all seem to agree that the undisclosed evidence meets *Brady*.

the court and the prosecution that they planned to show that [appellee] shot [the victim] in self-defense and in defense of Lucy. (Citation omitted). Defense counsel argued that he was entitled to show past bad acts of [the victim] as evidence of why Lucy was "terrified" of [the victim] and why [appellee] had a reasonable belief that use of deadly force was necessary that day [when appellee shot the victim five times in the back with a .38 revolver in the driveway of Lucy's home]. Defense counsel told the trial court that he planned to show that Lucy wanted to end her relationship with [the victim]; that [the victim's] behavior had grown increasingly aggressive toward Lucy due to his use of anabolic steroids; that [the victim] had grown increasingly jealous; that [the victim] had choked Lucy; that [the victim] had wire-tapped her telephone; that [the victim] had made threats to kill Lucy and her family if she left him; that Lucy had asked [appellee] and his wife to stay with her the night before the shooting because [she] was afraid of [the victim].

*State v. Masonheimer,* 154 S.W.3d 247, 250 (Tex.App.-Eastland 2005).

Appellee's first trial in December 2002 was before a jury. Soon after appellee's first trial began, the defense discovered during its cross-examination of a State's witness, Timothy Marshall, that the State had failed to disclose a statement that Marshall made to the police shortly after the offense (the Marshall statement). In this statement, Marshall, who was a neighbor of Lucy's, told the police that appellee told him minutes after the shooting that the victim "had threatened his daughter and it was either him or her." Appellee moved for a mistrial, but the trial court granted appellee a continuance and ordered the State to reexamine its file for exculpatory evidence that should be disclosed to the defense.[2] The trial court later granted another defense-requested mistrial "in the interest of justice" because a death in the family of one of the prosecutors caused the trial court to extend the continuance. Appellee's first trial, therefore, ended in a defense-requested mistrial in part because of the State's failure to disclose the Marshall statement. Soon after this, the lead prosecutor (Harper) left the district attorney's office to become a County Court–at–Law Judge.

Joiner, the assistant prosecutor in the first trial, became the lead prosecutor in the second trial. During a pretrial conference prior to the second trial, Joiner disclosed to the defense a statement from Lucy's ex-husband Billy Glenn Williams (the Williams statement) that also had not previously been disclosed to the defense. The Court of Appeals' opinion summarizes the Williams statement:

> At a pretrial conference prior to the second trial, defense counsel expressed his concern that all exculpatory evidence had not been provided by the State. Although the new lead prosecutor represented to the trial court that all exculpatory evidence had been provided, he agreed to provide defense counsel with a

**2.** The trial court ordered the State to disclose to the defense any evidence that was "clearly exculpatory" and to turn over to the court for an *in camera* inspection "anything borderline that the State has any doubts about at all about whether or not it's exculpatory evidence."

[THE COURT]: I'm going to order a couple of things. I'm going to order the State to reexamine its file, and if, you know, there's anything borderline that the State has any doubts about at all about whether or not it's exculpatory evidence, then the State will submit that to me in camera, then I'll look at it. If you should discover something that is clearly exculpatory, obviously you know to give that to the Defense as soon as possible.

statement given by Billy Glenn Williams, Lucy's ex-husband. In that statement, Billy Williams related that Lucy had asked him to keep their children during the afternoon of the day before [the victim] was shot; that, when he called Lucy around 6 p.m., she "broke down and told me about the trouble she had been having with [the victim]"; that Billy told her to go to the police and get a restraining order; that Lucy told him that she thought [the victim] had put dirt in her car's gas tank; and that Lucy was upset when they finished the telephone conversation.

*Masonheimer,* 154 S.W.3d at 252.[3]

Appellee subsequently pled *nolo contendere* to the murder charge without an evidentiary stipulation, requiring the State to present evidence establishing appellee's guilt. *See* Article 1.15, TEX.CODE CRIM. PROC.[4] During this proceeding (or second "trial") before the trial court in April 2003, Joiner disclosed to the defense more previously undisclosed evidence. This undisclosed evidence was a statement from one of the victim's friends (Upchurch), which prompted another mistrial motion by appellee. The Court of Appeals' opinion summarizes this evidence (the Upchurch statement):

> Upchurch was the first witness called by [appellee] in support of its [mistrial] motion. Upchurch, a friend of [the victim's], testified that he had helped remove [the victim's] belongings from the apartment after [the victim's] death. Upchurch took five old Coke machines to a store in Baird to be sold on consignment. The owners of the store, Mark and Tricia Duque, had known [the victim] and had sold Coke memorabilia for him in the past. Upchurch said that he, Mark, and Tricia had opened one of the Coke boxes and discovered several "syringes with orange caps" and small cardboard boxes. Upchurch asked Tricia, a practicing nurse, what the boxes were, "and she said steroids." Upchurch told Tricia to throw the syringes and boxes away because he did not want [the victim's] ex-wife to know that [the victim] had kept steroids.

*Masonheimer,* 154 S.W.3d at 253.[5]

In July 2003, the trial court held a hearing on appellee's mistrial motion. Testi-

---

**3.** The Court of Appeals agreed that the Williams statement should have been disclosed to the defense because it would "rebut any prosecution evidence showing that [the victim] was a peaceful man" and it would "rebut any contention by the prosecution that Lucy's testimony concerning [the victim's] stalking behavior was recently fabricated to help her father develop a theory of self-defense." *See Masonheimer,* 154 S.W.3d at 252.

**4.** The second proceeding on appellee's *nolo contendere* plea, however, was not an ordinary plea proceeding as reflected by the record in the hearing on appellee's pretrial writ of habeas corpus:

> [APPELLEE'S COUNSEL]: Judge, as You're well aware, we convened this case for the second time on April the 21 st where [appellee] entered a plea of no contest to this Court, and on that day, as you will very well recall, you admonished both the State,

as well as [appellee], of what you expected to take place in that evidentiary hearing. You admonished the State that they would be required—since this wasn't a very typical plea-type case; it wasn't when we were pleading guilty. We pled no contest, and you admonished the State that they would be required to provide sufficient evidence to sustain a finding of guilt. You also told the Defense that we would be entitled at that time, after the State rested, to put on evidence of any defenses, if we had those, in that case, and everybody was well aware of that, I think, before we began.

**5.** Appellee's counsel claimed at the mistrial hearing that evidence of the victim's steroid use was an important issue to the defense. *See Masonheimer,* 154 S.W.3d at 250. Appellee's counsel asserted that "we had been told that [the victim] had told some people that he used steroids and that that information had

mony was presented at this hearing that the lead prosecutor (Judge Harper) in the first trial and his investigator (Clappart) were aware of the Upchurch statement prior to the first trial. *See also id.* Clappart testified that he and Harper interviewed Upchurch before the first trial, and, during that interview, Upchurch made the above-summarized statement. Clappart also testified that he made notes of his interviews with the Duques and that he believed that he gave these notes to Harper. None of this information, including Clappart's notes, were in the State's file. Clappart did not believe that Joiner (the second prosecutor) knew about the Upchurch statement. Harper testified that he did not recall receiving the information contained in the Upchurch statement.

Q. [APPELLEE'S COUNSEL]: Well, do you understand that both [sic] John Upchurch has testified that you were there and You're the one he was directing this information to; Steve Clappart has also testified you were there and that you were the one that the information was directed to; that after—that he was making notes, he thinks, at the time; that when he had conversations with these other two people that confirmed the Upchurch version, that he went back and told you that that's what the people had said, and he thinks he

gave you his notes about that. Does that jog your memory?

A. [HARPER]: That Steve gave me his notes?

Q. Yeah. Or at least told you about it. It's his opinion he gave you the notes. He can't specifically say he gave you notes; he told you about it.

A. I don't recall that, but if that's true, then, yes, it should have been given to you.

\* \* \*

Q. Assuming again the scenario that I'd asked you to assume earlier in the testimony of what Mr. Upchurch and Mr. Clappart have testified to, and based upon your testimony and your notes, assuming that is the meeting—

A. That—

Q. —the one thing we know is, either Mr. Clappart and John Upchurch are lying to the Court, or you intentionally didn't write those things down. Would you agree with that?

[JOINER]: Objection, Your Honor. Speculation.

Q. Well, what other option do you see?

A. I know that Mr. Joiner visited with witnesses independently, I know that Mr. Clappart visited with witnesses in-

---

been passed on to [appellee] prior to the shooting. We had no direct evidence of his steroid usage other than what [the victim] had represented to others." Appellee presented, at the mistrial hearing, the testimony of a physician who was treating the victim for depression shortly before the shooting. This physician testified that he was not aware that the victim may have been using steroids and that any use of steroids by the victim could have caused "aggression, anger, irritability." Harper testified that he knew before the first trial that any use of steroids by the victim was "very critical" to the defense.

   Q. [APPELLEE'S COUNSEL]: So you knew that, at least from our standpoint, we

thought that the use of steroid was very critical?

A. [HARPER]: At some point in the pretrial part of it, yes, I did.

\* \* \*

Q. But you do concede that the stash of steroids, that if you had known that, that would certainly be vitally critical to our defense?

A. When I note—found notice of it, when Mr. Joiner told me about it, he told me he was giving it to you, this was recent, I agree that that should have been given to you, yes.

dependently, I know that on occasion I visit with witnesses independently. I don't know if they visited and they discussed that or not. I know that on this occasion this is what we talked about.

Q. Are you just baffled about how all this happened, Judge?

[JOINER]: Object, Your Honor. Argumentative.

[APPELLEE'S COUNSEL]: I don't mean to be argumentative.

[TRIAL COURT]: Overruled.

Q. Are you just baffled about how we got in this position with Upchurch and Clappart saying they told you, you admitting that it—we should have had it on discovery, and everybody conceding we didn't get it.

A. That's correct. You—if—You should have gotten it. Even if I did not know about it, Mr. Burke, we're presumed to know the information that our officers have taken notes, police officers; even if we in good conscience didn't know about it, as I understand the law, we're supposed to give it to you. That's what I'm saying.[6]

Joiner testified at the hearing on appellee's mistrial motion that he first became aware of the Upchurch statement when he interviewed Upchurch during the second trial in April 2003. Joiner immediately disclosed this information to the defense.

Joiner admitted that the Marshall, Williams, and Upchurch statements should have been disclosed to the defense prior to the first trial in December 2002. *See also Masonheimer,* 154 S.W.3d at 253 ("To his credit, Joiner admitted that all three statements should have been disclosed as *Brady* material prior to the first trial"). The State made no claim that it had no obligation to disclose this evidence prior to the first trial.[7]

Appellee's current counsel, who was also appellee's counsel in the first trial, testified in narrative form at the hearing on appellee's mistrial motion:

[APPELLEE'S COUNSEL]: We proceeded to [the first] trial in December 2002. At that time Burt Burnett was also assisting my son and I in preparation of the case. There are untold numerous times while we were working on this case the month prior to trial that I would say to them, "How in the world is the State going to prove that [appellee] is the one who shot [the victim] without introducing his statement?" meaning [appellee's]. I had the feeling, based upon some things that had transpired, that they were not going to put on [appellee's] statement. We could never answer that question: How are they going to prove it? Because they had given us all of the exculpatory evidence, and of course they wouldn't have to give us

---

6. Harper also testified that he did not believe that the Marshall statement "might be exculpatory or favorable to the defendant."

> Q. [APPELLEE'S COUNSEL]: Can you understand how that statement—"he was threatening"—to the man that first comes up, with the body lying in the street, and says, "What happened?" and he says "He was threatening my daughter, and it was him"—or however—or "him or me," whatever those words are, you don't understand how that might be exculpatory or favorable to the defendant?
>
> A. [HARPER]: I did not.

7. Appellee's counsel also argued at the mistrial hearing:

> I believe that based on the testimony of the State's own witnesses, and what I mean by that is [Upchurch, Clappart, Harper, and Joiner], they all believe that these three pieces of evidence at this time they knew about would be favorable to the Defense and sure enough they didn't give them to us. [Clappart and Joiner] all even went a little further to state that they agree that those are three pieces of evidence that, in accordance with [*Brady*], would be considered exculpatory evidence.

that; I kept saying, "There must be somebody that either saw it or told them that, that—that he told them he did." We get into the trial, and the third witness, Timmy Marshall, when he makes the statement, which the Court has in Defense Exhibit No. 4, in response to Judge Harper's question, that "He said he shot him" and was going to continue on but then was interrupted,[8] and I leaned over and told either Mr. Burnett or my son, "Now we know the answer to my question."

After Mr. Marshall finished testifying, we started asking him questions, found out he'd given a statement, got a copy of his statement. That's the first time that we had ever seen Defendant's Exhibit No. 14. With a very hurried reading in Court, I then asked for a recess, and we began what later led to hearings and everything else about their failure to furnish us with that in conformity with the judge's order of discovery that it contained exculpatory statements that had not been afforded us. A mistrial was subsequently declared in that case before we did anything further.

\* \* \*

Now, in response to what they told us about—or didn't tell us, on Timothy Marshall's statement. And in response to my question, how are they going to prove it up, it was my professional opinion, after practicing law for some thirty-seven years, that only an idiot would have proved up murder through [Police Chief] Bob Jones, that Bob Jones was going to give us some awfully good testimony, which he did, and in front of the jury I think that would have been devastating to them. The same thing is true with why they wouldn't want to introduce [appellee's] statement. They weren't going to do it that way, either. And I kept telling the boys, "They got something, folks. They've got something," and then we find it was Tim Marshall, during the trial, on a statement that we were entitled to, that they tried to keep from us, I think.

The State argued to the trial court at the hearing on appellee's mistrial motion that there is no evidence that it "did this to goad them into asking for a mistrial, or that [it] knew that if they found this out that it would goad them into a mistrial." The State further claimed that the posture of this case was a "plea hearing" and that the appropriate remedy was not a mistrial but to allow "the Defense to withdraw their plea, they can choose the factfinder

---

**8.** At the mistrial hearing, appellee's counsel suggested through his direct examination of Harper that Harper intentionally cut Marshall off during his direct examination of Marshall at the first trial when Marshall was about to testify that appellee told him minutes after shooting the victim that the victim had threatened him.

[APPELLEE'S COUNSEL]: Do you recall in [the first trial] Mr. Marshall, in response to your question, "Did you ask [appellee] anything?" his answer was, "Yes, sir. I asked him if he did it. He said yes." And he started to continue on, "He said that he threatened—" and you interrupted him, raised your hand and interrupted him and asked another question. Do you recall that?

A. [HARPER]: [The reporter's record from the first trial] reads—it—the only way I can do it is the way it reads.

The reporter's record from appellee's first trial appears to reflect that Harper interrupted Marshall when he was about to testify that appellee told him that the victim had threatened him:

Q. [HARPER]: Did you ask [appellee] anything?

A. [MARSHALL]: Yes, sir. I asked him if he did it. He said yes. He said that he threatened—

Q. How was his demeanor?

they want, they can choose the plea they want, and we can try this case." [9]

Appellee claimed, among other things, that "the decision was made to come in and waive a jury and to enter a plea of no contest before this Court by the Defense based upon erroneous and false information." Appellee also claimed that the second proceeding was a trial and not "just a big plea hearing." Appellee asserted that he still had "a defense of self-defense before the Court" and that the second proceeding should not be characterized "like we just came into court, signed a stipulation and confession, and here we go on punishment, and that's certainly not what we've been listening to for the first two days of trial." Appellee further claimed that the State's failure to disclose the exculpatory evidence was done in "bad faith" and that the "only remedy at law at this time this Court can grant to protect [appellee's] due process rights afforded him by the Constitution of the U.S. and the Texas State Constitution is to grant a mistrial."

> [APPELLEE'S COUNSEL]: The problem is, see, they tell us now, but they've known since October of 2002 that there were steroids found. They don't tell us till a day in after we've selected a trier of fact.

I don't agree with Mr. Joiner. He wants to make this sound like this just a big plea hearing. This is a trial. It was made clear to us before we started that this Court was going to hear evidence on guilt-innocence. This court still has to determine whether or not there's sufficient evidence beyond a reasonable doubt to sustain his finding of guilt, assuming that's where this Court would be headed. We still have a defense of self-defense before the Court. So I don't characterize this like we just came into court, signed a stipulation and confession, and here we go on punishment, and that's certainly not what we've been listening to for the first two days of trial. It's been guilt-innocence type of evidence.

They say that they're not withholding it? And the Court will recall this. We only got Mr. Marshall's statement last time after we had twelve people seated in this room and I was about to start his cross examination and asked him whether or not he had given a statement to the D.A.'s office, to which he responded "Yes." At that time I walk around counsel table and get it from [Harper] and find that it has these statements about that this man told Mr. Marshall the man had been threatening his daughter and it was either him or her.

---

**9.** Since some of the witnesses through whom the steroid evidence would have been presented apparently were unavailable, the State also offered to stipulate that the victim was in possession of steroids. The trial court responded that the defense "might have elected to have a jury trial instead of going to court" had the State timely disclosed this evidence.

> [THE STATE]: Your Honor, our remedy would be to say, you know, we'll stipulate that these are steroids. Aside from what they're—I guess they're saying that these were deliberately kept out. It's our position that they were not deliberately kept out and that we will do what we can to erase the harm by not being able to contact these

witnesses by saying we will stipulate that if you contacted them, they would say it was steroids, which is what the evidence that we have is what they would say. There was no evidence of testing, say—you know, we'll say they were steroids. Give them the benefit of the doubt, I guess.

> [TRIAL COURT]: Of course, their argument is they've been harmed because, had they had this information before Monday, they might have elected to have a jury trial instead of going to the Court.

> [STATE]: I understand, Your Honor.

> [TRIAL COURT]: That's their position on that.

They all admit that's exculpatory now. Yeah, they sure enough gave it to me, but not in accordance with *Brady*. They gave it to me at their own convenience. The Williams statement was only given after a pretrial that this Court had when my father asked the Court to look at the State's file, and it was determined that wasn't necessary but the D.A., Mr. Joiner, was going to go through the file and just make sure there wasn't anything else in there, and then he hands over Mr. Williams' statement. This is again after the first trial we had we were alleging they were withholding exculpatory evidence, and now we all agree, by their own testimony, that sure enough, some statements that are held in Mr. Marshall's—or, excuse me, in Mr. Williams' written statement are also exculpatory and could be considered mitigating or favorable to the Defense.

And then, yes, we got the information Tuesday afternoon, regarding the steroids from Mr. Joiner, but, Judge, you heard the testimony from [Clappart]: He knows that's exculpatory, he thinks he told Mr. Harper, remembers doing that, can't find any notes, believes it should have been given over to us, believes it would have been favorable, knows that we were asserting steroids in this case, and yet nobody says a darn thing. They knew that prior to the first trial.

If that doesn't show some bad faith on the part of somebody from the district attorney's office I don't know what does. We were in here voir diring a jury panel of people in this courtroom, bringing up steroids, and these people withholding evidence that they know they found steroids? Evidence that now they're willing to stipulate before this Court? When I started this motion I said we don't have a big enough rug to keep sweeping this under, and I submit that

that's true today. We just have stuff getting piled up now on top of the rug after the testimony yesterday.

The only remedy at law at this time this Court can grant to protect this man's due process rights afforded him by the Constitution of the U.S. and the Texas State Constitution is to grant a mistrial. Thank you.

After hearing the parties' arguments, the trial court granted appellee's request for another mistrial. The trial court also made an oral finding on the record that the Marshall, Williams, and Upchurch statements "are all exculpatory evidence under *Brady v. Maryland*" and that the State's failure to disclose this exculpatory evidence prior to the first trial was "reckless conduct."

[TRIAL COURT]: I find that in this case the statements and the evidence that was withheld concerning Mr. Marshall's statement, Mr. Williams' statement, and the evidence given by Mr. Upchurch, are all exculpatory evidence under *Brady v. Maryland.* I find that the evidence was—particularly the Upchurch evidence, was a surprise during this trial, and the Marshall evidence was a surprise during the first trial. I find the evidence is favorable to the Defense and certainly material and relevant to the defense that they are raising, which is that of self-defense or defense of a third party.

I also find that it's a violation of due process and a violation of the Texas Constitution and U.S. Constitution for this information not to have been provided to the defendant before the very first trial, not this trial but the first trial.

I find, therefore, that the only remedy available to this Court is that of a mistrial. The Court now declares a mistrial in

this case. The case remains on the Court's docket.

Court's in recess.

Let's get back on the record just a moment, please. I also find that the conduct of the State in not providing this information about which they knew to the Defense in a timely manner constituted reckless conduct.

Appellee subsequently filed a pre-trial writ of habeas corpus "seeking relief from double jeopardy." This motion sought to bar any further prosecution of appellee. Although this motion asserted that any further prosecution of appellee was barred by the double-jeopardy provisions of the state and federal constitutions, it relied almost exclusively on our state constitutional double-jeopardy provision and the trial court's finding that the State engaged in "reckless conduct" in failing to disclose the *Brady* material before appellee's first trial. The trial court held a hearing on appellee's pretrial writ of habeas corpus,[10] during which appellee relied almost exclusively on this Court's decision in *Bauder v. State*[11] in support of his claim that any further prosecution of him is jeopardy-barred under our state constitution. Appellee also argued that "this hadn't been any prosecution seeking justice" and that "[f]rom day one their investigation, every-

thing they've done, has just been set out not for a fair trial, but to get a conviction in this case."

[DEFENSE]: I'll make another copy of [*Bauder*].

*Bauder* is a case that we believe to be on point. and [sic] I think the State of Texas would probably concede that fact. They have a brief here that breaks it down at length in some form or fashion, but it is *Bauder v. State*, May 8th of 1996, and it's the Court of Criminal Appeals sitting en banc, where they apply standards for jeopardy as well as exculpatory evidence and jeopardy barred prosecutions thereon.

A point I'd like to make before I sit down here in a minute and let the State argue—because I've read the State's brief responding to our Application for Habeas Corpus wherein they say that the *Bauder* holding is that you've got to find a conscious disregard on the part of the—on the part of the prosecutor. Well, then in their brief they go on, and I think it's—anybody that's been to law school, conscious disregard typically equals recklessness. That's what we believe that to be akin to, and that's certainly the way this case sets it out. But what I think is very important in *Bauder*, if you go on an [sic] read the entire

---

10. At the beginning of this hearing, appellee's counsel reminded the trial court that the second trial "wasn't a very typical plea-type case" and that the trial court indicated that it would permit appellee "to put on evidence of any defenses" at this second trial, suggesting that appellee might avoid conviction or that his defensive evidence could be considered in mitigation of punishment.

> [APPELLEE'S COUNSEL]: Judge, as You're well aware, we convened this case for the second time on April the 21 st where Mr. Masonheimer entered a plea of no contest to this Court, and on that day, as you will very well recall, you admonished both the State, as well as the Defendant, of what

you expected to take place in that evidentiary hearing. You admonished the State that they would be required—since this wasn't a very typical plea-type case; it wasn't when [sic] we were pleading guilty. We pled no contest, and you admonished the State that they would be required to provide sufficient evidence to sustain a finding of guilt. You also told the Defense that we would be entitled at that time, after the State rested, to put on evidence of any defenses, if we had those, in that case, and everybody was well aware of that, I think, before we began.

11. 921 S.W.2d 696, 699 (Tex.Cr.App.1996).

case, they do hold conscious disregard in the first, but then go on to state—and I want to cite this in the second paragraph of the holding—(reading) making the Constitutional rights of a criminal Defendant to turn upon such a fuzzy and imponderable distinction as whether the prosecutor actually intended the trial to be terminated or being aware that his conduct creates a risk that a mistrial is reasonably certain to occur, consciously disregards that risk seems far too insensitive a criterion for decisions in these cases. In short, we don't believe the purpose of the Constitutional right here in issue really has anything to do with the Prosecutor's specific intent.

Now, I know this Court has already held, and I think we're bound by that, on April 24th that they acted recklessly, but I think we can even take it a step further. If the Court hadn't held as such, *Bauder*, I don't think, requires us to have a specific finding. If you read *Bauder* that way, it makes it—and it makes sense. How in the world are we supposed to figure out what these people are doing?

Now, you can look at their course of conduct. I may have my opinion. Mr. Masonheimer certainly has his opinion in regards to what these folks have been doing all along, but I think trying to put us in the position to convince this Court that they acted with some specific mens rea would be ridiculous, and I think that's what *Bauder* stands for.

This is a case, Judge, that the facts are these: There was a specific discovery order where *Brady* material was ordered to be disclosed. There were pretrial hearings where the State has represented that they gave us all the exculpatory evidence. We know now that they withheld evidence that this

Court has determined to be exculpatory, three pieces particularly. We have stopped the proceedings both times prior to judgment. This is not a case where a new trial is in effect, but we're prior to judgment during an evidentiary hearing. We had a mistrial granted based on the fact that these three pieces of evidence were not given and that they were exculpatory, being favorable, being relevant, being material to our Defense, and then we have a finding that the conduct on the part of the District Attorney's office was reckless.

In accordance with *Bauder* and in accordance where [sic] the Constitution of the United States and the Texas State Constitution via the 14th Amendment, I think this Court is in a position where they are required to grant our Application for Habeas Corpus and find that double jeopardy has attached in this case, and that's what we're going to ask the Court to do.

\* \* \*

What it's about is you have a case, *Brady*, that says, "You're supposed to—you have an affirmative duty, Mr. Joiner or Mr. Harper, or Mr. Clappert as your agent, to make sure that all exculpatory or mitigating evidence is turned over to the Defense prior to time of trial." We have a pretrial order telling them that, just in case they don't know it, and then when you show up at trial and they don't give it, and **they get caught**[12] December the 6th, and then you show up in April, and we have a pretrial, and they say, "we've given everything to you," and sure enough, we find again there's another statement they haven't given us, and then we show up April 27th and find

12. Emphasis supplied.

out that there's steroids they haven't given us or evidence thereof. We keep violating *Brady*, and when you violate *Brady*, you violate the due process rights of this man, and you violate the double jeopardy clause of the Constitution, and that's—it's simple. It's a simple analysis, really, in this case.

So, no, I'm not here to punish them. I'm here to do, I guess, what they should be doing, which is justice. This hadn't been any prosecution seeking justice. From day one their investigation, everything they've done, has just been set out not for a fair trial, but to get a conviction in this case. They've gone to lengths that I can't believe, and when they get disagreements between their own employees or agents and former employees, I think that shows you how serious this matter has become, but it shouldn't prejudice our client. That's not what it's all about.

We understand the record to reflect that the State argued that further prosecution of appellee is not jeopardy-barred because the trial court should have continued the second trial instead of terminating it since the Marshall, Williams, and Upchurch statements had been disclosed to appellee before the second trial was terminated. Appellee's counsel responded that it took "two trials, numerous pretrial hearings, [and] two motions for mistrial" to get this evidence and that the State's tardy disclosure of this evidence did not prevent appellee "from being tried time and time again."

[APPELLEE'S COUNSEL]: The other thing is, is when they start talking about due process and that we haven't focused on it, Your Honor, you've already found this was a violation of due process at the time you granted the mistrial, but due process focuses on the Defendant under this circumstance, not the State. You know, they keep coming—they tell us, "Don't worry about it. Now they've got our entire file." Great! What's it taken us to get their entire file? It's taken us two trials, numerous pretrial hearings, two motions for mistrial, and sure enough, maybe we've got it now. All I know is every time we get ready for trial and start putting on evidence, what do you know, we find more exculpatory evidence. We're trying to protect this man from being tried time and time again.

At the conclusion of the hearing on appellee's pretrial writ of habeas corpus, the trial court made an oral finding that "double jeopardy has attached" and ordered the case dismissed with prejudice. The trial court later signed an order dismissing the case with prejudice based on its finding that "the instant offense is barred by the Double Jeopardy Clause of the United States and Texas Constitutions."

The State appealed, and the Court of Appeals decided that further prosecution of appellee is not jeopardy-barred under either the state or federal constitutions. *See Masonheimer,* 154 S.W.3d at 251. The Court of Appeals decided that there is no evidence that the "new lead prosecutor in the second trial" acted "intentionally, a critical *mens rea*" for federal constitutional purposes under *Oregon v. Kennedy* or "recklessly, a critical *mens rea*" under *Bauder. See Masonheimer,* 154 S.W.3d at 251. Appellee filed a petition for discretionary review, and the State filed a cross-petition for discretionary review.

After the Court of Appeals decided this case, this Court overruled *Bauder* in *Ex parte Lewis,* 219 S.W.3d 335 (Tex.Cr.App. 2007). In *Lewis,* this Court adopted, as a matter of state constitutional law, the federal constitutional standard set out in *Ore-*

*gon v. Kennedy*[13] for determining whether a retrial is barred after a defense-requested mistrial. *Lewis,* 219 S.W.3d at 371. The issue, therefore, is whether the record supports the trial court's ruling that any further prosecution of appellee is jeopardy-barred under the *Oregon v. Kennedy* standard. And, since appellee won in the trial court, we must view the evidence in the light most favorable to the trial court's ruling.[14]

■ In considering whether the State acted "intentionally" under the *Oregon v. Kennedy* standard, the Court of Appeals considered only the *mens rea* of the "new lead prosecutor." *See Masonheimer,* 154 S.W.3d at 251, 254. Appellee claims in his first ground for review that the State encompasses the entire prosecutorial team (not just the "new lead prosecutor") in determining whether the State acted "intentionally." We agree that, in determining whether the State acted "intentionally" under the *Oregon v. Kennedy* standard, it is necessary to also consider the *mens rea* of the lead prosecutor in the first trial. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.").

The *Oregon v. Kennedy* decision was intended to "delineate the bounds" of the "narrow exception" to the general rule that there is no jeopardy bar to a retrial after a defense-requested mistrial. *See Oregon v. Kennedy,* 456 U.S. at 673, 102 S.Ct. 2083. The *Oregon v. Kennedy* standard delineating these bounds is usually read to mean that a retrial after a defense-requested mistrial is jeopardy-barred only when the prosecutorial "conduct giving rise to the successful motion for a mistrial was intended to provoke [or goad] the defendant into moving for a mistrial." *See Oregon v. Kennedy,* 456 U.S. at 676, 679, 102 S.Ct. 2083; *Lewis,* 219 S.W.3d at 335.[15]

In support of this specific proposition, *Oregon v. Kennedy* cites to footnote three in *United States v. Tateo.*[16] *See Oregon v. Kennedy,* 456 U.S. at 673 n. 4, 102 S.Ct. 2083. In *Tateo,* the defendant claimed that a retrial was barred after his conviction was set aside on collateral attack because of prejudicial comments that the trial court made in the prior trial. *See Tateo,* 377 U.S. at 463–64, 84 S.Ct. 1587. In rejecting this claim, the Court noted that if "Tateo had *requested* a mistrial on the basis of the judge's comments, there would be no doubt that if he had been successful, the Government would not have been barred from retrying him." *See Tateo,* 377 U.S. at 467, 84 S.Ct. 1587 (emphasis in original). The *Tateo* Court then stated in

---

**13.** 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

**14.** *See State v. Kelly,* 204 S.W.3d 808, 818–19 (Tex.Cr.App.2006).

**15.** This apparently would apply even when the prosecutorial misconduct (though accompanied by an intent to provoke a mistrial) was not so seriously prejudicial as to compromise the defendant's valued right to have his guilt-innocence determined before the first trier of fact. *But see Oregon v. Kennedy,* 456 U.S. at 676, 102 S.Ct. 2083 and cases cited. For example, under a strict application of the

"intending to goad the defendant into moving for a mistrial" language in *Oregon v. Kennedy,* a retrial would be jeopardy-barred after the defense-requested mistrial provoked by the comment in *Oregon v. Kennedy* (State referring to defendant as a "crook") as long as the State intended to provoke this defense-requested mistrial even though its comment obviously did not compromise the defendant's valued right to have his guilt-innocence determined by the first jury.

**16.** 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

footnote three of its opinion that "[i]f there were any intimation in a case that prosecutorial or judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused, different considerations would, of course, obtain." *See Tateo*, 377 U.S. at 468 n. 3, 84 S.Ct. 1587. The Court's opinion in *Oregon v. Kennedy* makes another citation to footnote three in *Tateo* as an example of the "narrow exception" to the general rule that there is no jeopardy bar to a retrial after a defense-requested mistrial. *See Oregon v. Kennedy*, 456 U.S. at 673, 102 S.Ct. 2083.

Another case that *Oregon v. Kennedy* cites for the proposition that retrial is barred when the prosecution intentionally goads a defendant into moving for a mistrial is *United States v. Dinitz*.[17] *See Oregon v. Kennedy*, 456 U.S. at 673, 102 S.Ct. 2083. In *Dinitz*, the defendant claimed that a retrial was jeopardy-barred after he successfully moved for a mistrial because of actions that the trial court took against one of his lawyers. *See Dinitz*, 424 U.S. at 602–06, 96 S.Ct. 1075. The Court rejected this claim, in part, because the trial court's

actions were not done "to prejudice [the defendant's] prospects for an acquittal." *See Dinitz*, 424 U.S. at 611, 96 S.Ct. 1075. The *Oregon v. Kennedy* case appears to cite with approval a similar statement from another plurality opinion stating that "where a defendant's mistrial motion is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might be barred." *See Oregon v. Kennedy*, 456 U.S. at 678–79, 102 S.Ct. 2083; *see also Ex parte Peterson*, 117 S.W.3d 804, 826 n. 7 (Tex.Cr.App.2003) (Hervey, J., dissenting).

■ Keeping in mind that we are required to view the evidence in the light most favorable to the trial court's ruling that prosecuting appellee a third time is jeopardy-barred, we are constrained to decide that the extensive portions of the record set out in this opinion support a finding that appellee's mistrial motions were necessitated primarily by the State's "intentional" failure to disclose exculpatory evidence that was available prior to appellee's first trial with the specific intent to avoid the possibility of an acquittal.[18] Un-

17. 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).

18. The trial court could have also reasonably found that the State believed that the undisclosed evidence may have made the difference between a conviction and an acquittal. Under these circumstances, appellee's valued right to have his guilt-innocence determined by the jury in the first trial and, "perhaps, end the dispute then and there with an acquittal" was something of a "hollow shell" even though this may not have become apparent until the middle of the second trial. *See Oregon v. Kennedy*, 456 U.S. at 673, 102 S.Ct. 2083. In *Dinitz*, 424 U.S. at 608, 96 S.Ct. 1075, the Court stated:

The distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause.

Even when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire "to go to the first jury and, perhaps, end the dispute then and there with an acquittal." (Citation omitted). Our prior decisions recognize the defendant's right to pursue this course in the absence of circumstances of manifest necessity requiring a *sua sponte* judicial declaration of mistrial. But it is evident that when judicial or prosecutorial error seriously prejudices a defendant, he may have little interest in completing the trial and obtaining a verdict from the first jury. The defendant may reasonably conclude that a continuation of the tainted proceeding would result in a conviction followed by a lengthy appeal and, if a reversal is secured, by a second prosecution. In such circumstances, a defendant's mistrial request has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, ex-

der *Oregon v. Kennedy*, this deliberate conduct, accompanied by this specific *mens rea*, bars a retrial. *See Oregon v. Kennedy*, 456 U.S. at 673, 678–79, 102 S.Ct. 2083; *Dinitz*, 424 U.S. at 611, 96 S.Ct. 1075; *Tateo*, 377 U.S. at 468 n. 3, 84 S.Ct. 1587; *United States v. Wallach*, 979 F.2d 912, 915–16 (2nd Cir.1992) (there is some force to the argument that *Oregon v. Kennedy* protects a defendant from a retrial after a defense-requested mistrial where prosecutorial misconduct [resulting in the mistrial, **not a reversal on appeal**] is undertaken with the intention of denying the defendant an opportunity to win an acquittal); *State v. Marti*, 147 N.H. 168, 784 A.2d 1193, 1196–97 (2001) (*Oregon v. Kennedy* would bar retrial after defense-requested mistrial when "prosecutor engaged in misconduct with the specific intent to avoid an acquittal which the prosecutor believed was likely to occur in the absence of the misconduct"); *State v. Lettice*, 221 Wis.2d 69, 585 N.W.2d 171, 181 (1998) (same); *State v. Colton*, 234 Conn. 683, 663 A.2d 339, 345–46 (1995) (same); [19] *see also Thanos v. State*, 330 Md. 576, 625 A.2d 932, 937–38 (1993) (double jeopardy does not

bar retrial after defense-requested mistrial unless State intentionally commits misconduct with the specific intent of forcing defendant to move or consent to mistrial or with the specific intent of prejudicing defendant's prospects for an acquittal if trial continued to verdict); *Hagez v. Maryland*, 131 Md.App. 402, 749 A.2d 206, 217–29 (2000) (*Oregon v. Kennedy* may prohibit a retrial after a defense-requested mistrial [**not a reversal on appeal**] resulting from State's deliberate conduct prompted by a desire to "sabotage" a probable acquittal) and at 229–31 (Moylan, J., concurring); *West v. State*, 52 Md.App. 624, 451 A.2d 1228, 1231–36, 1233 (1982) (retrial after defense-requested mistrial is jeopardy-barred under *Oregon v. Kennedy* when "prosecutorial or judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused") (quoting footnote three in *Tateo*); [20] *Tabbs v. State*, 43 Md.App. 20, 403 A.2d 796, 812 (1979). We are persuaded that, in a case like this, a defendant suffers the same harm as when the State intentionally "goads" or provokes the defendant into

pense, and delay occasioned by multiple prosecutions.

**19.** These latter three cases (*Marti, Lettice*, and *Colton*) decided that *Oregon v. Kennedy* would bar retrial under these circumstances even when there was no defense-requested mistrial and the defendant's conviction was reversed on appeal. The rule applied in this case, however, is limited to retrial after a defense-requested mistrial. This rule arguably would not apply to a retrial after a reversal of a defendant's conviction on appeal because, in such a situation, the defendant's valued right to have guilt-innocence determined by the first trier of fact has not been compromised. *See Oregon v. Kennedy*, 456 U.S. at 676, 102 S.Ct. 2083.

**20.** In *West*, 451 A.2d at 1235, the Court stated that what "is encompassed by intentional misconduct ... is not the mere general intent to do the act but, additionally, the special intent to attain some specific end thereby." *West*

provides two situations where retrial after a defense-requested mistrial is jeopardy-barred under *Oregon v. Kennedy. See West*, 451 A.2d at 1235. The second, more familiar, situation is a mistrial when the prosecution intentionally commits some erroneous act with the specific intent to provoke or goad the defendant into moving for a mistrial to avert a probable acquittal. *See id.* The first, less familiar, situation is a mistrial when the prosecution attempts not to get caught intentionally committing some erroneous act (e.g., not disclosing evidence) with the specific intent to avoid a probable defeat. *See id.* The evidence in this case supports this latter situation. Also, recall that the State claimed at the mistrial hearing that there is no evidence that it "did this to goad [the defense] into asking for a mistrial, or that [it] knew that **if [the defense] found this out** that it would goad them into a mistrial." (Emphasis supplied).

moving for a mistrial.[21] Under the unique circumstances of this case, we decide that a third prosecution of appellee is jeopardy-barred under state and federal constitutional double-jeopardy principles.

The judgment of the Court of Appeals is reversed, and the judgment of the trial court is affirmed.[22]

MEYERS, J., filed a concurring opinion.

KELLER, P.J., filed a dissenting opinion.

WOMACK, J., filed a dissenting opinion in which KELLER, P.J., joined.

COCHRAN, J., filed a dissenting opinion.

MEYERS, J., concurring.

In this case, the conduct of the State was questionable, but we are stuck with the old standard from twenty-five years ago when the Supreme Court addressed this question in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). As we know, that case is not very clear on how to analyze whether a prosecutor's actions were intended to goad the defendant into requesting a mistrial. In response to the difficulties in applying the *Oregon v. Kennedy* standard, we came up with a new standard in *Bauder v. State*, 921 S.W.2d 696 (Tex.Crim.App.1996). In that case, we held that prosecution after the granting of a defense-requested mistrial is jeopardy-barred not only when the objectionable conduct of the prosecutor was intended to induce a motion for mistrial, but also when the prosecutor was aware of, but consciously disregarded, the risk that his conduct would lead the defendant to request a mistrial. *Id.* at 699. Even though the State never lost a *Bauder* case, they still petitioned us numerous times to do away with *Bauder*. So we did, in *Ex Parte Lewis*, 219 S.W.3d 335 (Tex.Crim. App.2007), holding that *Bauder* was too expansive, and the Double Jeopardy provision in the Texas Constitution should be treated the same as the Fifth Amendment's Double Jeopardy Clause. Now we are back to the *Oregon v. Kennedy* standard and the same problems with attempting to apply it.

My reading of *Oregon v. Kennedy* is that if the State's intentional actions goad the defendant into requesting a mistrial, then retrial is jeopardy-barred. Rather than considering whether the State actually wanted a mistrial, we look to see if the improper conduct of the State was intentional. In most cases, the circumstances

**21.** *See* Adam M. Harris, Note, *Two Constitutional Wrongs Do Not Make A Right: Double Jeopardy and Prosecutorial Misconduct Under The Brady Doctrine*, 28 Cardozo L.Rev. 931, 944–52 (November 2006) (if *Oregon v. Kennedy* bars a retrial where a prosecutor commits an act of misconduct with the intention of provoking a mistrial motion by the defendant, it should also bar a retrial where a prosecutor commits grave misconduct with the intent to avoid an acquittal he believes is likely, because the defendant suffers the same harm in both cases), and at 946 ("Under the rule set out in [*Oregon v. Kennedy*], the prosecutor violates the Double Jeopardy Clause when he has a specific intent to cause a mistrial, purportedly to avoid an acquittal. [Footnote omitted]. In the case where a prosecutor proceeds to trial in violation of *Brady*, the prosecutor still subjects the defendant to the identical risk of mistrial, with the intent of securing a conviction. [Footnote omitted]. There should be no distinction between these two situations.").

**22.** We believe that this renders moot the claim presented in the ground for review in the State's cross-petition for discretionary review that *Brady* does not apply to a *nolo contendere* plea under the Supreme Court's decision in *United States v. Ruiz*, 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002). We do not believe that this would apply to the not "very typical plea-type" second proceeding in this case.

leading a defendant to request a mistrial are accidental, such as a State's witness blurting out unelicited, inadmissible testimony. However, if we look at the State's actions and see that the prosecutors are intentionally doing things that they should anticipate would lead a judge to grant a mistrial if the defendant requested one, then it does not matter whether the State actually wanted a mistrial. The prosecutors may say that they did not want a mistrial, but if their actions were intentional rather than accidental or careless, and they should have known that a mistrial would be granted, then the *Oregon v. Kennedy* standard is met and retrial is jeopardy-barred. Rather than trying to determine the subjective intent of the prosecutor, we can objectively look at the actions of the State to determine if the actions were intentional.

Obviously here the actions of the State in withholding exculpatory evidence were intentional. Appellee was goaded into requesting the mistrial by this improper, intentional conduct, and therefore I agree with the majority that retrial is jeopardy-barred. With these comments, I join the majority opinion.

KELLER, P.J., dissenting.

### Oregon v. Kennedy.

In *Oregon v. Kennedy*, the Supreme Court articulated the standard under the federal constitution for determining when a mistrial that is granted at the request of the defendant gives rise to a double jeopardy violation: *"Only* where the governmental conduct in question is intended to 'goad' the defendant into moving for a

mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." [1] The Court stated this exclusive standard not once, but twice, the second time saying, "the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for mistrial was *intended to provoke the defendant into moving for a mistrial."* [2] Intent to provoke a mistrial is an essential requirement in this context. Under the federal constitution, no other circumstances will give rise to a jeopardy bar. As the Court correctly notes, we recently adopted this federal standard as a matter of state constitutional law.[3]

The Court nevertheless holds that double jeopardy can bar retrial when the prosecutor does not intend to provoke a mistrial. The Court finds in the present case that the prosecutor withheld information "with the intent to avoid the possibility of an acquittal" and construes *Kennedy* to erect a double jeopardy bar to retrial. I believe that *Kennedy* does not support this conclusion.

The Court reads ambiguity into the above statements in *Kennedy*, based upon the Supreme Court's citations to *United States v. Dinitz*[4] and *United States v. Tateo.*[5] But in *Kennedy*, the Supreme Court recognized that language taken from its earlier opinions—including *Dinitz* and *Tateo*—might "well suggest a broader rule" than the one the Court ultimately

---

**1.** 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982) (emphasis added).

**2.** *Id.* at 679, 102 S.Ct. 2083 (emphasis added).

**3.** *Ex parte Lewis*, 219 S.W.3d 335 (Tex.Crim. App.2007).

**4.** 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).

**5.** 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

adopted.[6] The Court acknowledged in *Kennedy* the confusion created by its prior cases, and the justifiability of that confusion, and articulated the "intent to provoke a *mistrial*" standard to resolve this confusion and clarify the law.[7]

### Cases interpreting *Kennedy*

The "intent to avoid an *acquittal*" standard that the Court adopts is the one articulated by the Second Circuit in *United States v. Wallach.*[8] But the *Wallach* court conceded that its standard reached further than the *Kennedy* standard.[9] And other courts, both approving and critical (as well as the law review article upon which this Court relies) have also acknowledged that the *Wallach* standard is not part of the rule articulated in *Kennedy*, but instead goes beyond it.[10]

The Court also relies on several cases from Maryland, most prominently *Tabbs v. State*[11] and *West v. State.*[12] But in *Tabbs*, the court said, "What emerges clearly is that the retrial bar is not intended as a sanction against judicial or prosecutorial error committed *for any other purpose than to abort* the first trial."[13] And ac-

cording to *West*, "it is only the deliberate derailing [of the trial] that will engage the gears of the double jeopardy machinery"[14]:

> Ordinarily, when the prosecutor injects error into the trial, grievous as that may be, the sanction is mistrial or reversal. It is only where the prosecutor deliberately subverts the right of the defendant to stay with the original tribunal that the double jeopardy bar becomes the appropriate relief. In distinguishing not between grave error and lesser error and not between intended error and unintended error, but rather between deliberate error designed to accomplish Purpose A and deliberate error designed to accomplish Purpose B, the Supreme Court was emphatic.[15]

The *West* court expressly distinguished between an intent to obtain a conviction through improper means and an intent to derail the trial:

> Even at the extreme end of the reprehensibility spectrum, however, where the prosecutor has committed *the deliberate foul*, there is still this pivotal distinction between (1) seeking to win the

---

**6.** *Kennedy*, 456 U.S. at 677–678, 678 n. 8, 102 S.Ct. 2083.

**7.** *Id.* at 679, 102 S.Ct. 2083.

**8.** 979 F.2d 912 (2d Cir.1992).

**9.** *Id.* at 916.

**10.** Approving: *See e.g. People v. Batts*, 30 Cal.4th 660, 695, 134 Cal.Rptr.2d 67, 68 P.3d 357, 380 (2003)(emphasis added), *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1432, 158 L.Ed.2d 91 (2004)("illuminates a double jeopardy interest beyond the narrow one recognized in *Kennedy*"). *State v. Marti*, 147 N.H. 168, 171, 784 A.2d 1193, 1196 (2001). Critical: *See e.g. United States v. Doyle*, 121 F.3d 1078, 1084, 1085 (7th Cir.1997); *United States v. Lewis*, 368 F.3d 1102, 1108 (9th Cir.2004), *cert. denied*, 543 U.S. 1053, 125 S.Ct. 901, 160 L.Ed.2d 775 (2005). *Hawkins v. Alabama*, 318 F.3d 1302, 1309 n. 5 (11th Cir.

2003)("This widening" of the standard "is not described" as "truly compelled by the *Kennedy* rule...." The inclination to widen *Kennedy* represents an independent judgment by these circuits on what the law ought to be in the circumstances contemplated by those circuit courts in those cases). *See* Adam M. Harris, 28 Cardozo L.Rev. 931, 942 (2006)(goes "much further doctrinally than *Kennedy* would seem to permit").

**11.** 43 Md.App. 20, 403 A.2d 796 (1979).

**12.** 52 Md.App. 624, 451 A.2d 1228 (1982).

**13.** *Id.* at 30, 403 A.2d at 802–803 (emphasis added).

**14.** *Id.* at 625, 451 A.2d at 1230.

**15.** *Id.* at 632–633, 451 A.2d at 1234 (emphasis added).

game unfairly and (2), knowing the game is going awry, deliberately causing it to be cancelled and rescheduled. *If the prosecutor wins the game unfairly, we make him replay it. When the prosecutor deliberately causes the game to be cancelled unfairly, we do not permit him to reschedule it.* This distinction is what the Supreme Court sought to communicate, as it concluded its discussion in *Oregon v. Kennedy.*[16]

### Application of *Wallach* standard

The *Wallach* standard was originally conceived as a method of extending double jeopardy protection against prosecutorial misconduct to post-verdict situations, e.g. to motions for new trial and appeals.[17] But even if the *Wallach* standard did apply in the mistrial context, such a standard should not result in appellant obtaining relief in this case. The suppressed evidence was consistent with appellee's defensive theories, and so, at the first trial, a continuance to obtain and evaluate the evidence should have been sufficient to cure any prejudice flowing from suppression. Indeed, the trial court initially granted a continuance. A defense-requested mistrial was later granted, not because of the suppression of evidence, but "in the interest of justice" because of a death in the family of one of the prosecutors. But even if we assumed that the failure to disclose exculpatory evidence "caused" the mistrial in some sense, the failure to disclose was clearly not the *reason* for the mistrial. And if appellee really was interested in proceeding to a verdict with the first jury, he could have requested another continuance rather than asking to terminate the trial. So the first mistrial did not implicate appellee's valued right to continue the trial with the first tribunal.

That leaves the second mistrial.[18] The defendant expressed an intent to plead "no contest," which has the same legal effect in Texas (with respect to criminal proceedings) as a guilty plea.[19] A defendant who pleads guilty is not entitled to the same kinds of due process protections with regard to the disclosure of evidence as someone who insists on a contested trial.[20] By pleading "no contest," a defendant waives his *right* to a contested trial, although the trial court might permit evidence contesting guilt in its discretion.

But even if we treat this second proceeding as a full-blown, contested trial, another problem appears. The trial in that event would be a bench trial. *Kennedy* spoke specifically about the right to proceed with the first *jury* empaneled. Although it seems reasonable to suppose that *Kennedy's* rationale could extend to a bench trial, this poses an additional complicating factor to a decision that is already depending on an expansion of the *Kennedy* standard. Some considerations may be different for a bench trial. Here, if the defendant truly wished to pursue a verdict with the trial judge, presumably, he could

---

**16.** *Id.* at 637, 451 A.2d at 1236 (emphasis added).

**17.** *Wallach,* 979 F.2d at 915–916.

**18.** Both the "Marshall" and "Williams" statements were disclosed before the second "trial" began, so only the "Upchurch" statement could provide a basis for a double jeopardy violation occurring at the second "trial."

**19.** *Young v. State,* 8 S.W.3d 656, 664 (Tex. Crim.App.2000).

**20.** *United States v. Ruiz,* 536 U.S. 622, 630, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002)("this Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor").

simply have obtained a continuance.[21] The only reason to obtain a mistrial (and the reason suggested in the trial record here) would be because the defendant would *not* have chosen a bench trial if he had known about the exculpatory evidence, but would have taken his chances with a jury. If that was case, then the defendant was not deprived of the right to have his case decided by the first tribunal (the trial judge) because, in light of the exculpatory evidence, he really did not want the trial judge to be his tribunal. By obtaining a mistrial, appellee received the opportunity to have his case tried by the tribunal he would have chosen absent the misconduct—a jury.

Saying all of this does not preclude the possibility of a dismissal with prejudice based on prosecutorial misconduct that does not meet the *Kennedy* standard. There is still due process.[22] To obtain a dismissal with prejudice under a due process claim, however, the defendant must raise the claim *after* trial and he must show he suffered actual and irremediable prejudice.[23]

I respectfully dissent.

WOMACK, J., dissenting, in which KELLER, P.J., joined.

### I.

As I understand the facts, there was no *Brady* violation in the first mistrial.

First, the evidence wasn't unknown to the defendant. The evidence in question was something that he said to a neighbor after he shot the deceased. It's pretty hard for a defendant to claim that he has been denied discovery of something he said to a non-officer.

Second, the existence of the statement was not undisclosed. The witness referred to it in direct examination, and it all came out. Even if the State had a wicked mind, there was no wicked result.

Third, we don't know that the statement would have remained undisclosed. The State had not turned it over before trial. But the non-discretionary right to a witness's statement is not in the pre-trial discovery statute; it's in Rule of Evidence 615, which requires production only after the witness's direct examination. It would be routine for a defendant to ask for a witness's statement at that point, if none had been provided previously. So as far as we know, the State would have turned over the witness's statement on a Rule 615 request.

Fourth, although the Court is very concerned about the failure to disclose the witness's statement before trial, the Due Process Clause doesn't require pretrial disclosure; it only forbids nondisclosure at trial—which did not happen.

---

**21.** And the defendant was hardly in a position to claim that he had prejudiced his cause before the judge by initially offering to plead no contest. If the plea proceeding really was not an "ordinary" no contest plea, but a contested trial in disguise, the trial court was presumably aware of the situation. If it was an ordinary plea proceeding, then the defendant had no right to the disclosure of exculpatory evidence at that proceeding, and thus, no grounds for a mistrial.

**22.** *See United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)(due pro-

cess implicated by prejudicial pre-indictment delay); *United States v. Zuno–Arce*, 25 F.Supp.2d 1087, 1115 n. 36 (C.D.Cal.1998), *aff'd*, 209 F.3d 1095 (9th Cir.2000)(specifically citing due process as a possible alternative to double jeopardy with regard to prosecutorial misconduct); Peter J. Henning, *Prosecutorial Misconduct and Constitutional Remedies*, 77 Wash. U.L.Q. 713, 820–823 (1999).

**23.** *Marion*, 404 U.S. at 326, 92 S.Ct. 455; Henning, *supra*.

Fifth, there's a little problem of how the defendant would have been able to get his hearsay statement admitted even after he found out about it.

Sixth, it doesn't look like the first mistrial was provoked by this "violation." As I understand it, after the disclosure of the defendant's statement to this witness, there was a delay because the court told the State to look for other discoverable evidence. During the delay, the lead prosecutor's relative died, and the defendant asked for the mistrial. It seems to me at least reasonable that, in addition to his courtesy in the circumstances of the death, the defendant wanted to have a new trial now that he knew how the State was going to be able to prove that the defendant shot the deceased. (*See pages* 499–500 of the opinion for the defense counsel's statements about being disadvantaged in his trial preparation by not knowing how the State would prove this fact. But remember, this disadvantage is not a due-process violation.)

## II.

The second mistrial was granted because the State did not disclose evidence about steroids. This mistrial was necessary only if the defendant wanted to withdraw his waiver of a jury trial. (A jury had been waived, and the defendant pleaded nolo contendere.) The defendant's argument about this proceeding being one in which he hoped for an acquittal is incredible to me. No one pleads guilty or nolo contendere hoping for an acquittal. If he had said that he waived a jury and pleaded not guilty because he thought he had a better chance for acquittal with the judge than with a jury, I could believe it. But

not that he entered a plea of nolo in hopes of an acquittal.

The opinion refers to Article 1.15's requirement of evidence (other than the plea) to establish guilt in a non-jury trial. But there obviously was such evidence; it was uncontested that the defendant intentionally killed the deceased.

If the defendant asked for a mistrial so that he could change his choice of factfinder, I might go for it, but that is not his theory.

## III.

I agree that the prosecutor was wrong, wrong, wrong in not giving the discovery that was ordered. But I do not see that it caused a violation of either the federal or the state jeopardy clause. I respectfully dissent.

COCHRAN, J., dissenting.

I most respectfully dissent.

Although I agree that this particular scenario might fit snugly within the spirit of *Oregon v. Kennedy*,[1] it does not fit within the letter of that law. But we are not free to stray into the spirit of the law. We are bound to follow the letter of the Supreme Court's law on federal constitutional matters until and unless that court reassesses or refines its position on double jeopardy as set out in *Kennedy*. The holding in *Kennedy* is crystal clear: double jeopardy bars a retrial only if the prosecutor commits manifestly improper conduct with the intent to goad the defendant into moving for a mistrial.[2] This case, however, involves a prosecutor who, it is asserted, intends to "win at any price" before a first jury, not one who intends to "get rid of this jury" so that he would have a better chance to win before a second one. The

---

**1.** 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

**2.** *Id.* at 676, 679, 102 S.Ct. 2083.

result is the same—the defendant loses his right to a fair trial before his chosen jury—but the prosecutor's "foul" intent is different, and, under *Kennedy,* that distinction is crucial for double-jeopardy purposes.

Some state courts, finding the reasoning and result in *Kennedy* unsatisfactory, have chosen to interpret their own state constitutions more broadly than the Supreme Court did in *Kennedy* to reach what they consider a more desirable result.[3] For ten years Texas did as well.[4] We have only recently returned to the federal double-jeopardy fold and its "bright line" *Kennedy* standard.[5]

One of the problems with deciding cases on independent state constitutional grounds is that the Supreme Court is not given the opportunity to reassess and re-fine the federal constitutional standard when state courts, dissatisfied with a purportedly parsimonious federal standard, create a different rule under their own constitutions. *Kennedy* was decided twenty-five years ago. The Supreme Court is not averse to reassessing its prior precedent when appropriate,[6] and this case (or another like it) might provide a suitable opportunity to consider a refinement of its "bright-line" rule in *Kennedy.* But until the Supreme Court does so, I cannot conclude that federal double-jeopardy principles bar yet another trial in this case.

## I.

The trial judge in this pretrial habeas corpus proceeding[7] found that the prosecution had "recklessly"[8] failed to disclose

---

3. *See, e.g., People v. Batts,* 30 Cal.4th 660, 665–66, 134 Cal.Rptr.2d 67, 68 P.3d 357 (2003) (holding that the double jeopardy clause of the California Constitution bars retrial following the grant of a defense-requested mistrial when the prosecution either intentionally goaded the defendant into requesting a mistrial or intentionally committed misconduct believing that the defendant would otherwise be acquitted); *Pool v. Superior Court,* 139 Ariz. 98, 677 P.2d 261, 271–72 (1984); *State v. Rogan,* 91 Hawai'i 405, 984 P.2d 1231, 1249 (1999); *State v. Breit,* 122 N.M. 655, 930 P.2d 792, 803–04 (1996); *State v. Kennedy,* 295 Or. 260, 666 P.2d 1316, 1326 (1983); *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321, 325 (1992).

4. *See Bauder v. State,* 921 S.W.2d 696, 699 (Tex.Crim.App.1996) (interpreting the Texas constitutional double jeopardy standard more broadly than the corresponding federal provision to include "reckless" misconduct and holding that retrial would be barred "when the prosecutor was aware of but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant's request").

5. *Ex parte Lewis,* 219 S.W.3d 335 (Tex.Crim. App.2007).

6. *See, e.g., Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (reconsidering its holding in *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), and holding that the Eighth and Fourteenth Amendments bar execution of those under 18 when they committed a capital offense); *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (reassessing its decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and holding that the Eighth and Fourteenth Amendments bar execution of those who are mentally retarded); *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (reconsidering its holding in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and holding that the Fifth and Fourteenth Amendments protect private adult consensual sexual relations between members of the same sex from criminalization).

7. The judge presiding over the habeas hearing was not the same judge who had presided over the original trial and mistrial, but he did preside over the second trial and mistrial.

8. Because the trial judge was following the then-current Texas constitutional standard set out in *Bauder,* he did not make specific findings on whether the prosecution team acted

three crucial items of exculpatory evidence in violation of *Brady v. Maryland:* [9]

1. Immediately after the shooting, Mr. Masonheimer told a neighbor, Mr. Marshall, that he had shot "Bo" Sanchez, his daughter Lucy's former boyfriend because Sanchez had threatened Lucy, and "it was either him or her." [10]

2. Billy Williams, Lucy's former husband, told investigators that Lucy had called him the night before the shooting to tell him about Sanchez's dangerous and threatening behavior. Lucy "broke down," and said that she thought Sanchez had put dirt in the gas tank of her car. Billy told her to go to the police and get a restraining order. [11]

3. While cleaning up Sanchez's garage apartment behind Lucy's home, John Upchurch, one of Sanchez's friends, found several syringes and vials hidden inside an antique Coke machine. Trish Duque, a registered nurse, was helping Mr. Upchurch in the clean-up, and she said the vials contained steroids. [12]

The lead prosecutor's repeated failure to turn over exculpatory material (material which he must have known was crucial because the defense attorney had, before trial, clearly explained his self-defense and defense-of-daughter theory on the record), coupled with his deliberate attempt to prevent Mr. Marshall from testifying about Mr. Masonheimer's spontaneous statement immediately after the shooting, [13] are objec-

---

"intentionally" under *Kennedy.* Although the objective facts in this record support the majority's conclusion that the first prosecutor acted intentionally, I would have remanded the case for further factual findings on this issue.

**9.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**10.** Mr. Marshall gave a written statement to the police with his version of Mr. Masonheimer's statement. This written statement was not given to the defense and the record from the first trial shows that the lead prosecutor deliberately cut Mr. Marshall off when he tried to testify to Mr. Masonheimer's exculpatory explanation.

**11.** Despite the judge's pretrial order to turn over all *Brady* material, his order during trial when he discovered that Mr. Marshall's exculpatory statement had not been turned over, and his order to re-examine the entire file for any other possible *Brady* material, the prosecution team did not give Billy Williams's written statement to the defense until confronted at a pretrial hearing shortly before the second trial.

**12.** The defense attorney established that the lead prosecutor and his investigator had interviewed Mr. Upchurch some two months before the first trial. Mr. Upchurch told them

of his discovery. Both the prosecutor and investigator took "copious" notes during this interview. They then called Trish Duque to confirm the discovery of the vials and her belief that they contained steroids. This information, though corroborating the defense theory that Sanchez had recently become violent and aggressive because of his steroid use, was not given to the defense until the middle of the second trial. Despite numerous *Brady* requests, orders, and admonitions from two trial judges, the State inexplicably failed to produce three obviously exculpatory items of evidence. Even more ominous, the defense suggests that there may be more unproduced exculpatory materials: the prosecution's investigator testified at the habeas hearing that Police Chief Bob Jones took pictures inside Sanchez's apartment, but those photographs have mysteriously disappeared.

**13.** The lead prosecutor specifically asked Mr. Marshall what Mr. Masonheimer told him immediately after the shooting. Mr. Marshall responded, "Yes, sir. I asked him if he did it. He said yes. He said that he had threatened—" At that point, the prosecutor interrupted with another question instead of allowing Mr. Marshall to complete his sentence. Mr. Marshall's written statement shows that Mr. Masonheimer told him that Sanchez had threatened his daughter. "It was either him or her."

tive facts that support the habeas judge's factual finding that the lead prosecutor was, at a minimum, "reckless."

I agree with the majority that these objective facts support a finding that the lead prosecutor acted "with the specific intent to avoid the possibility of an acquittal." [14] His conduct of intentionally depriving the defense of obviously exculpatory evidence during the first trial was "manifestly improper." But these facts and circumstances do not demonstrate that the lead prosecutor was motivated by a desire to "goad" the defense into requesting a mistrial. Instead, it is a fair conclusion that he was acting with the intent to "win at any price" a trial that, had he turned over the *Brady* material, he likely would have lost. These objective facts support the defense attorney's position at the habeas hearing that the lead prosecutor "got caught," not once, not twice, but three separate times in deliberately failing to turn over exculpatory evidence to the defense. This repeated misconduct led to two separate mistrials. [15]

## II.

The constitutional question is whether the double-jeopardy clause of the United States Constitution bars a retrial if (1) the lead prosecutor intended to "sabotage" the fairness and accuracy of a first trial by hiding exculpatory evidence, and (2) that manifestly improper misconduct required the defendant to request and obtain a mistrial.

At least one state court has suggested that the double-jeopardy principles expressed in *Kennedy should* bar a retrial when the prosecutor "sabotages" the first trial whether he intends to goad the defendant into requesting a mistrial or whether he simply intends to obtain a conviction by "foul means," but got caught at it. [16]

The double-jeopardy clause " 'affords a criminal defendant a valued right to have his trial completed by a particular tribunal.' " [17] But, said the Supreme Court in *Kennedy*, "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on [a] defendant's motion ... does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." [18] The question that the Supreme Court has not addressed in the twenty-five years since *Kennedy* is whether there is

---

**14.** Majority op. at 507–08.

**15.** The first mistrial was actually declared after a death in the second prosecutor's family, but it was indirectly caused by the lead prosecutor's misconduct. The lead prosecutor's failure to turn over Mr. Marshall's statement caused the defense to request a mistrial. The trial judge declined to immediately grant a mistrial and instead granted a continuance to decide whether the trial could later proceed before the same jury if all exculpatory evidence were properly produced in the interim. As is now known, the additional exculpatory material was not produced. But before the trial judge could make any final decision about the mistrial requested for the *Brady* violation, the death of the second prosecutor's family member necessitated a mistrial.

**16.** *See West v. State,* 52 Md.App. 624, 451 A.2d 1228, 1235 (1982) (stating that *Oregon v. Kennedy* would bar retrial if the prosecutor committed misconduct "knowing it to be error, but desiring to 'sabotage' a probable loser either 1) by snatching an unexpected victory from probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting the probable acquittal and living to fight again another day. (A calculated sabotaging of a perceived 'lost cause' in either event; an indifference to whether he is caught or not.)").

**17.** *Kennedy,* 456 U.S. at 671–72, 102 S.Ct. 2083 (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)).

**18.** *Id.* at 675, 102 S.Ct. 2083.

any degree of intentional prosecutorial "harassment or overreaching" which, though intended to win a trial it would probably otherwise lose, is covered by the mistrial prong of the Double Jeopardy Clause. If successful "goading" into a mistrial results in a bar against retrial, why not unsuccessful "sabotage" which results in a mistrial? It would seem that in both instances the prosecutor intended to subvert the protections afforded by the Double Jeopardy Clause: a reasonably fair trial before the chosen factfinder.

It seems to me that this extension is no less of a "bright-line" rule than that set out in *Kennedy*. Both would require the trial judge to find that the prosecutor's conduct was manifestly improper—committed with specific "foul" intent [19] to avert an otherwise likely acquittal from the chosen factfinder.[20] The difference is only between a "goading" or a "sabotaging" intent. It seems to me that the issue in *Kennedy* concerned the brightness of the "bright-line" rule concerning the prosecutor's "foul" intent, not whether that intent was specifically directed toward making the defendant request a mistrial or toward

"winning at any price" including intentional sabotage.[21]

There might not be a constitutionally meaningful distinction between intentionally "goading" the defendant into requesting a mistrial and intentionally "sabotaging" the defendant's right to a fair trial by prosecutorial foul play when either results in a mistrial granted for "manifest necessity." But only the United States Supreme Court can answer that question.

---

**19.** As poetically put by Chief Judge Gilbert of the Maryland Court of Special Appeals, this is the specific intent to commit a foul, the deliberate "hitting below the belt" or the calculated "personal foul" performed with the thought in mind that the foul might well be detected for what it is. By borrowing from the game of football for an analogy, we liken that specific intent to force a mistrial to a defensive back's wilful and deliberate interference with the offensive team's down field pass receiver. The defense knows that by performing the illegal act that constitutes the foul, he will probably be caught and his team penalized. Nevertheless, the offender prefers to take the penalty rather than give up the touchdown that most likely would occur were the foul not committed.
*Lee v. State*, 47 Md.App. 367, 423 A.2d 267, 269 (1980).

**20.** Although "it hurts the defendant just as much to have prejudicial blasts come from the trumpet of the angel Gabriel," *United States v. Nettl*, 121 F.2d 927, 930 (3d Cir. 1941), the *Kennedy* double-jeopardy bar applies only when those prejudicial blasts were intended to subvert the defendant's valuable right to have his fate fairly decided by his chosen factfinder. Just as a dog knows the difference between being kicked and being stumbled over, a trial judge must, under *Kennedy*, determine, from the objective facts and circumstances, whether the prosecutor's misconduct was intentionally "below the belt" or merely negligent.

**21.** *See Kennedy*, 456 U.S. at 675, 102 S.Ct. 2083 (stating that a rule "that examines the intent of the prosecutor ... is a manageable standard to apply").