**Affirmed and Opinion filed December 22, 2016.**



In The

# Fourteenth Court of Appeals

NO. 14-15-01072-CR
NO. 14-15-01073-CR

**THE STATE OF TEXAS, Appellant**

**V.**

**ROBERT JOSEPH YETMAN, Appellee**

**On Appeal from the 176th District Court
Harris County, Texas
Trial Court Cause Nos. 1473046 & 1490556**

## O P I N I O N

In this appeal, we consider whether the trial court abused its discretion in granting a criminal defendant's application for pretrial habeas-corpus relief. The trial court held that the constitutional prohibition against double jeopardy bars the defendant's retrial following a mistrial because the prosecutor, seeking to avoid an acquittal, goaded the defense into requesting the mistrial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellee Robert Joseph Yetman was indicted for indecency with a child. Appellee was accused of touching the genitalia of a seven-year old boy at Memorial Hermann Hospital, where appellee worked as a medical doctor and the boy was a patient.

The complainant had suffered an asthma attack while in the care of an aunt. The aunt initially took the complainant to an emergency care center. After learning the complainant would be transferred to Memorial Hermann Hospital, the aunt arranged for a family friend to accompany the complainant so that the aunt could return home to care for the complainant's siblings, who also were in the aunt's charge while the children's mother was out of town. The following morning, the aunt came to the hospital and the family friend left.

That morning appellee was making rounds at Memorial Hermann Hospital with medical residents. Appellee entered the complainant's hospital room sometime around 8:00 a.m., accompanied by at least three residents. According to appellee and a resident who watched appellee examine the complainant, appellee performed a normal exam and did not touch the complainant's genitalia. Appellee later asked that a social worker evaluate the complainant before the complainant's discharge. Appellee left the hospital at 11:37 a.m.

There was a period of time that morning when the complainant was in his hospital room unaccompanied by a relative or family friend. The aunt told police the complainant was unaccompanied from 7:00 a.m. until 9:00 a.m., but the aunt testified at trial that she may have arrived at the hospital later than she originally indicated.

At some point after the aunt returned to the hospital, the complainant went to

2

the restroom and the aunt checked on him because he seemed to be taking a long time. The complainant told his aunt that his penis was hurting. When the aunt asked why, the complainant told her that "some guy" came in and touched it. Upon further questioning from the aunt, the complainant stated that the man who touched his penis had gray hair and was wearing a white coat. The complainant demonstrated the way the man touched his penis by jerking a napkin twice. The aunt looked at the complainant's penis and did not notice anything unusual. The aunt then contacted the complainant's nurse, who examined the complainant's penis and noticed some reddening. The nurse informed the resident on call, Dr. Carmelita Taylor. Dr. Taylor did not notice any injuries to the complainant's penis. Dr. Taylor telephoned appellee and updated appellee as to the complainant's medical status, and also informed appellee of the complainant's allegations. Appellee asked Dr. Taylor if the complainant could be discharged and Dr. Taylor advised that the complainant could be discharged after meeting with a social worker. A social worker met with the complainant later that afternoon and the complainant was discharged in the evening.

The complainant's mother returned from her trip later that night and the aunt went home. The next morning, the complainant told his mother about the incident at the hospital. The complainant's mother took the complainant to Texas Children's Hospital, where a sexual assault nurse examiner examined the complainant. The nurse noted that the complainant had two wounds on his penis. The penis looked red and swollen, and had nail marks. The complainant's mother took the complainant to the police station. After questioning, the complainant eventually identified appellee as the individual who had touched him. The complainant also was taken to the Children's Assessment Center, where Susan Odhiambo interviewed him. According to Odhiambo, the complainant disclosed

things to her and showed her things using his body. Dr. Marcella Donaruma examined the complainant at the Children's Assessment Center and noted the injuries on the complainant's penis. The complainant described appellee as the individual who touched his penis.

Appellee was charged with indecency with a child. Appellee pled "not guilty." A two-week jury trial followed. In the final minutes of the State's final argument to the jury, the prosecutor made statements that twice prompted appellee's counsel to object and move for a mistrial. The first time the trial court sustained the objection, instructed the jury to disregard the prosecutor's statements, and admonished the prosecutor. But, the trial court declined to grant a mistrial. Immediately, the prosecutor made another statement that drew an objection from appellee. Again, appellee moved for a mistrial. This time the trial court granted it.

Appellee then filed an application for pretrial writ habeas-corpus relief[1] on the ground that the constitutional prohibition against double jeopardy barred retrial. The trial court granted the habeas-corpus relief. The State, as appellant, now challenges the trial court's ruling.

## ISSUE AND ANALYSIS

In a single issue the State asserts the trial court abused its discretion in granting appellee's pretrial writ of habeas corpus. Generally, a criminal defendant may not be put in jeopardy by the State twice for the same offense. U.S. Const. amend. V; *Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014). In cases tried by a jury, a defendant is placed in jeopardy when the jury is empaneled and

---

[1] Appellee's double-jeopardy claim is a proper subject for pretrial habeas-corpus relief because delaying appellate review of a double-jeopardy claim prejudices an accused's guarantee against being twice put to trial for the same offense. *See Ex parte Watkins*, 73 S.W.3d 264, 273 (Tex. Crim. App. 2002).

4

sworn, and "because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 504, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)). Despite the general prohibition against jeopardy-barred trials, there are two exceptions in which a criminal defendant may be tried again without violating double-jeopardy principles when the prosecution ends prematurely as the result of a mistrial: (1) the defendant consents to a retrial, or (2) there was a manifest necessity to grant a mistrial. *Id.* at 769–70.

When a defendant requests a mistrial, the defendant has elected to terminate the proceedings against him and the double-jeopardy clause generally does not bar retrial. *Oregon v. Kennedy*, 456 U.S. 667, 672–73, 102 S.Ct. 2083, 2088, 72 L.Ed.3d 416 (1982); *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007) (adopting the standard articulated in *Oregon v. Kennedy* for determining when to grant double jeopardy relief after a defense-requested mistrial). But, even where a defendant moves for mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial where the prosecutor's actions giving rise to the motion for mistrial were done "to goad the [defendant] into requesting a mistrial." *Oregon*, 456 U.S. at 672–73, 102 S.Ct. at 2088 (quoting *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976)).

When a trial court grants a pretrial application for habeas corpus on this ground, the reviewing court must determine whether the record supports the trial court's ruling that any further prosecution of the appellee is jeopardy-barred under the *Oregon v. Kennedy* standard. *Ex parte Masonheimer*, 220 S.W.3d 494, 506 (Tex. Crim. App. 2007). Because the appellee won in the trial court, we view the evidence in the light most favorable to the trial court's ruling and we are to uphold

the ruling absent an abuse of discretion. *Id.* When a trial court makes explicit findings of facts, the appellate court determines whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

The Court of Criminal Appeals, in *Ex parte Wheeler*, 203 S.W.3d 317 (Tex. Crim. App. 2006), set out the following non-exclusive factors to assist the trial court when assessing the prosecutor's state of mind:

> (1) Was the misconduct an attempt to abort a trial that was going badly for the State? Put another way, at the time the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?
>
> (2) Was the misconduct repeated despite the trial court's admonitions?
>
> (3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?
>
> (4) Was the conduct "clearly erroneous"?
>
> (5) Was there a legally or factually plausible basis for the conduct despite its impropriety?
>
> (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?

*See id* at 323–24. Using the *Wheeler* factors as our guide, we consider the record evidence.

*Trial Testimony*

At trial, the State introduced evidence from the complainant's mother, the mother's partner, and the complainant's aunt regarding the details of the complainant's hospital stay and allegations against appellee. The complainant testified that appellee came into his room, did not listen to his heart or lungs, but "touched me inappropriately . . . in my privates." The complainant testified that appellee "jiggle[ed]" the complainant's private part and that made the complainant

feel sad and uncomfortable. According to the complainant, his penis stung after the incident. The complainant testified that "Robert Yetman" had touched him and explained that the source of his knowledge came from reading the doctor's name badge. On cross-examination, the complainant clarified that his penis burned when he went to the bathroom, but it otherwise was fine, although he also testified that he got scabs from the doctor "playing with his private parts" and that the scabs bled. The complainant denied telling a nurse or another doctor about the incident and also denied that anyone at the hospital looked at his penis. The complainant maintained that appellee came into his room just one time while the complainant was at the hospital. Officer Sharee Waters testified that throughout her investigation, the complainant maintained appellee came into his room, alone, a single time.

The sexual assault nurse examiner testified that the complainant would not give details about the incident but said his injuries occurred while he was at the hospital for an asthma attack. The sexual assault nurse examiner acknowledged that the complainant's wounds could have been caused by his soiled underwear or a zipper injury. Dr. Donaruma did not ask the complainant about the cause of his injuries, but she examined his penis and noticed the injuries. She testified that the training of pediatric residents is erratic, so the resident and nurse may have missed the injury. Like the sexual assault nurse examiner, Dr. Donaruma acknowledged that the injuries were consistent with a zipper injury, though she noted that the complainant had not mentioned a zipper injury. The mother's partner testified that the complainant's penis was itchy and she and the mother saw the complainant scratching his penis.

Dr. Christina Dang testified that she admitted the complainant to the hospital, took his history, and conducted a physical exam in the middle of the

7

night.  The following morning, Dr. Dang made hospital rounds with appellee.  Dr. Dang explained the rounds are the process of reviewing patient treatment with the attending physician, in this case appellee, and the rest of the treating team.  Dr. Dang's team included herself, another supervising resident, and an intern.  Dr. Dang testified that rounds usually took between two and three hours.  According to Dr. Dang, it takes about ten to fifteen minutes to "round" on an individual patient, although the timing can vary depending on the complexity of the patient's medical condition.  She also testified that the night before had been particularly busy.

Dr. Dang stated that she was with appellee the entire time he conducted rounds, including appellee's visit to the complainant's room.  Dr. Dang's trial testimony was corroborated by her notes and an order she placed at 8:01 a.m. for the complainant to be evaluated by a social worker.  Dr. Dang testified that the team went into the complainant's room, appellee performed an exam, the team discussed the treatment plan, and then moved to the next patient.  Dr. Dang testified that appellee did not perform a genital exam on the complainant.

Dr. Dang testified that she and appellee "rounded" on the complainant and determined the complainant should be discharged the following evening or early the next morning as long as the patient was cleared by a social worker.  Dr. Dang explained the rationale for getting the social-worker clearance, noting her concern that the complainant was at the hospital with an adult that did not know anything about the child's medical history and that the child was staying with an aunt and they were not able to control the child's asthma at home because they could not find the child's inhaler.

Dr. Thao Nguyen testified that he rounded with appellee on the morning in question.  According to Dr. Nguyen, the shortest amount of time an attending physician could complete an assessment on a patient would be between ten and

fifteen minutes. When pressed on whether a doctor could assess a child without a parent present any faster, Dr. Nguyen stated that the shortest amount of time a round could be conducted would be five minutes. Dr. Nguyen testified that on the weekend, appellee likely would have rounded with two different teams, one after the other. Dr. Nguyen and Dr. Dang were part of the first team. Based on the medical records, Dr. Nguyen testified that he must have rounded on the complainant, but he did not remember the round.

Dr. Annie Joleen Kayanickupuram testified that she rounded with Dr. Nguyen, Dr. Dang, and appellee that morning as well. Dr. Kayanickupuram testified that she was present when appellee visited the complainant, that she stood at the threshold of the doorway, and watched the exam. Dr. Kayanickupuram testified that appellee examined the complainant's lungs and that there was nothing remarkable about the exam. Dr. Kayanickupuram also confirmed the names of the patients her team saw that day and testified that she and the other residents were with appellee the entire time he conducted rounds.

Dr. Rebecca Girardet, a child-abuse pediatrician, testified that she did not think the complainant's allegations made sense. According to Dr. Girardet, the complainant's initial statements were complaints of pain in his penis that he associated with the doctor. The complainant initially tugged on his pants in the first mention of the matter. Dr. Girardet explained that the final description of the way the doctor moved his hand around the complainant's penis would be impossible given the size of the complainant's penis. The explanation made sense for an adult, but not a seven-year-old child. Dr. Girardet testified that in her opinion she did not think the complainant's injuries and statements indicated abuse occurred.

Dr. Girardet did not believe the complainant was consciously lying, but that

9

something irritated his penis that day, he associated the pain with the doctor, and his account of what happened might have evolved under the influence of well-meaning adults asking leading questions. According to Dr. Girardet, neither the complainant's description of burning pain during urination, nor the scabs that later could be seen on his penis were consistent with the nature of contact the complainant alleged. Dr. Girardet also testified that if appellee had caused the injuries later observed on appellant's penis, those injuries would have been visible to the complainant's aunt, the nurse, and the resident who examined the complainant. But, none of the three mentioned any injuries. The State cross-examined Dr. Girardet, noting that she normally testified for the State, and suggesting that if the person accused of sexual abuse had been a janitor rather than appellee (a doctor), Dr. Girardet would be testifying for the State. Dr. Girardet testified that she did not believe in the merits of the State's case in this instance and that she would not put her reputation on the line for appellee.

Appellee testified in detail regarding his activities on the morning in question. Computer records showed appellee logged onto a hospital computer between 7:19 a.m. and 7:26 a.m. Appellee explained that he arrived at the hospital and then "signed off" on the patients admitted the previous night. Computer records showed appellee logged back onto the hospital computer from 10:03 a.m. until 10:24 a.m. and then again from 10:32 a.m. until 11:15 a.m. Appellee then left the building and exited the parking garage. Appellee testified that between 10:24 a.m. and 10:32 a.m., he was responding to an emergency situation, tending to a patient who was potentially dying. Appellee's testimony about that patient was confirmed by the patient's medical records and testimony from a hospital resident, Dr. Jian Azimi-Bolurian, who was on the second team that rounded with appellee that morning.

10

Relying on medical records and his memory, appellee testified about each patient he visited that morning and the medical care each patient received. Appellee rounded on fifteen patients that morning and was able to reconstruct the order in which he saw the patients. At 9:10 a.m., there was a record showing that appellee ordered a dermatology consult on the sixth patient out of the fifteen. Appellee explained that the initial patients took longer for rounds than the remaining patients, some of the patients were newly admitted and the team spent a lot of time with one patient who had been diagnosed with diabetes the night before. Appellee testified that he saw the remaining nine patients between 9:10 a.m. and 10:03 a.m., at which point he finished rounds and logged onto the computer to begin writing patient notes.

Appellee testified that he did not return to the complainant's room. Appellee denied ever touching the complainant's genitalia. In addition, appellee presented the testimony of multiple character witnesses and evidence that the complainant's mother had retained a personal-injury lawyer who had sent a letter to Memorial Hermann Hospital threatening to bring a civil lawsuit. The mother's attorney stated that it was in the best interests of the attorney's clients and the hospital to "put this matter behind them as soon as possible," and that the client would initiate a civil lawsuit "if justice is not served."

*The Complainant's Home Life*

The State asked each witness, including appellee, why they did not report the complainant's allegations. Appellee explained that he expected the allegation to be addressed by the social worker when the social worker visited the complainant. Appellee was asked why he thought the consult with the social worker was necessary and whether he heard any testimony that made him worry about the complainant's family life. Appellee explained that he was concerned

11

because he had received conflicting statements about the complainant's mother's whereabouts. In addition, appellee was concerned that the complainant had come to the hospital because the family could not find the child's medication. Appellee also testified that "[the complainant's] therapy was completely backwards. He was not on steroids at all. He was using Albuterol far too often, which is potentially life threatening, especially in an African American child." Appellee explained that use of the drug Albuterol in an African American child is especially dangerous because:

> lots of use of Albuterol in African American children is associated with a higher incidence, a higher chance of [th]em having some heart arrhythmias, so we try to avoid both long acting steroids – Albuterol is a short acting beta, what we call beta agonist. We try to avoid using a lot of those in African American children.

> And then there's another form that are called a long acting beta agonist, and we avoid those at all costs in African Americans because there's a higher chance of having an arrhythmia in the heart that will cause them to go into heart flutter and die.

Appellee explained that the frequency with which the complainant was using Albuterol was not enough to cause him to have a heart arrhythmia, but under that therapy, the complainant was suffering asthma attacks every one to two weeks, which is something appellee explained "nobody should have to experience." Appellee explained that the complainant would be symptomless if he were using steroids. Dr. K. Smith agreed the complainant had not been receiving ideal therapy for asthma. Dr. Smith explained that Albuterol is a "rescue drug" in an asthma patient that is used only in the middle of an attack. Dr. Smith testified that children should be on steroids because if a child uses the rescue drug frequently, it can stop working and the patient can die.

*Closing Argument*

In closing argument, the State argued that in addition to rounding on the complainant, the appellee entered the complainant's room a second time at some point between 9:30 a.m. and 10:03 a.m. The State then asked the jury to imagine what the complainant's mother has gone through to pursue this case. The prosecutor explained that the defense wanted the jury to think the complainant's mother concocted the complainant's story, but, according to the prosecutor, this was a difficult case to take on — "it's like David and Goliath in here. Goliath being all this, all of the lawyers, the general counsel, the defendant and his friends with their accolades and their accomplishments and their positions of power that they hold." In rebuttal, the prosecutor characterized the defense in the following way:

> What you heard from the defendant was five hours of him telling you how important he is. He made every opportunity to try to trash and bash that family and that child, blurting out things that weren't even in evidence. To try and make you think that they are less than him. That you can't believe them because they're less than, because he's not being taken care of correct, because African American children shouldn't be on Albuterol.

At this statement the gallery spontaneously erupted, prompting the trial court to admonish the spectators. Appellee's counsel objected to the prosecutor's statements. The trial court sustained the objection, instructed the jury to disregard the comment, and denied appellee's mistrial motion. Immediately after the trial court denied appellee's mistrial motion, the prosecutor stated, "You see what [the complainant's] up against?" Appellee objected. The trial court sustained the objection and instructed the jury to disregard the comment. The appellee then moved for mistrial, which the trial court granted.

13

*Application for Pretrial Writ of Habeas Corpus*

Following the mistrial, appellee filed an application for habeas-corpus relief in which he alleged that jeopardy should attach to the trial because the prosecutor goaded the defense into requesting a mistrial to avoid an acquittal. In support of his application for pretrial habeas-corpus relief, appellee attached affidavits from jurors. Juror Rathe stated in his affidavit that during closing arguments, after individuals in the gallery made inarticulable comments, he heard prosecutor Johnson reply, "it's because he's black." Rathe stated that he was offended that the State introduced race into the closing arguments. According to Rathe, the evidence did not show appellee committed the offense. Rathe stated that after the trial court declared a mistrial, the jurors took an informal straw poll of all the jurors, including the alternates, at a time when only the jurors were present. In the straw poll, there were thirteen "not guilty" votes and one possibly "guilty" vote. The juror who said "possibly" stated that the juror wanted to look at two pieces of evidence to make sure, for the juror's own peace of mind, that appellee was not guilty. The juror did not want to convict appellee, and the juror stated that the juror easily could have been persuaded to vote "not guilty." Rathe thought that the jury would have found appellee "not guilty."

Juror Carl submitted an affidavit stating that she felt she had "seen a full courtroom farce play out." She thought appellee was not guilty. Carl believed something terrible happened to the complainant, but the police conducted a flawed investigation. According to Carl, appellee established a solid timeline, corroborated by many witnesses, proving appellee was never alone with the complainant. Carl was frustrated that the State "appealed to our baser instincts." Carl stated that during closing arguments, the prosecutor twisted appellee's words in an attempt to imply that appellee was racist. Carl felt that "The State of Texas

14

treated me, as a juror, like an idiot."

Juror Levy also submitted an affidavit in which she stated that she was angry and did not feel that appellee had been proven guilty. According to Levy, she felt the complainant's testimony was rehearsed and that his injuries were caused by his "filthy underwear." Levy stated that the "prosecution went to some really low levels to try and prove their case and did not even come close." Levy believed the complainant's mother was trying to extort money from the hospital. Levy felt that the State's closing arguments were racist and said she could not believe the prosecutor had a job at the District Attorney's office.

In addition to the jurors' affidavits, appellee also submitted affidavits from individuals sitting in the gallery during the State's closing argument. One spectator stated that she heard the prosecutor say that appellee chose to molest the complainant because he was poor and black. Another stated that she saw several jurors frown, shake their heads, and drop their jaws in disbelief during the prosecutor's rebuttal argument.

In response to appellee's application for writ of habeas corpus, the State argued that the prosecutor's reference to the complainant's race was a reference to appellee's testimony in which appellee stated that the complainant should not have been prescribed Albuterol because of his race. According to the State, the prosecutor's question about "what the complainant was up against" was a reference to the inappropriate outburst from the gallery. The State contended that the prosecutor did not make this argument because the trial had gone poorly or because appellee's acquittal was imminent.

In support of its position, the State submitted the affidavit of the prosecutor who made the objectionable statements. The prosecutor stated she was anxious to finish the lengthy, tedious trial, and that she believed that the State's witnesses

15

came across as credible. According to Johnson, she did not want the complainant or his family to be forced to endure another trial. She stated that she mentioned race only once, while summarizing appellee's testimony, and that she did not engage in intentional misconduct designed to goad the defense into requesting a mistrial.

Johnson's co-counsel also submitted an affidavit in which she stated that she did not expect the judge to grant a mistrial, noting that after she entered into a line of forbidden questioning during trial about sexually explicit material purportedly found on appellee's computer, she did not bring the subject up again. According to co-counsel, on the day of the mistrial, she and Johnson were tired and emotionally spent. She stated that they had no idea what the jurors were thinking because the jurors had been poker-faced throughout trial.

*The Trial Court's Order*

In granting appellee's application for pretrial habeas-corpus relief, the trial court concluded that jeopardy had attached because the State intentionally attempted to goad appellee into moving for a mistrial so that the State could avoid an acquittal. The trial court made eighty-one fact findings, including the following:

> • During its closing argument, the prosecutor argued by inference that the complainant's race was a factor in his "victimization" and this statement was not supported by the evidence.
>
> • The prosecutor's comment provoked gasps of shock and audible comments of disapproval from some members of the audience. The jurors also appeared shocked or surprised by the prosecutor's statements.
>
> • The prosecutor's attitude and provocative sidebar comments displayed open and obvious contempt for the Court's rulings.
>
> • The prosecutor's arguments and remarks demonstrated that she was

16

unwilling to limit the scope of her statements to permissible areas of jury argument.

• The prosecutor's pattern of inappropriate conduct and improper argument shows her behavior was intentional and deliberate.

• The prosecutor intentionally engaged in conduct that forced defense counsel to move for mistrial.

• Ms. Johnson knew that her final comment would force the defense counsel to request a mistrial in order to preserve error.

• In the face of an impending acquittal, the timing of Ms. Johnson's improper conduct demonstrates her intent to force the Court to order a mistrial.

• The prosecutor failed to credibly explain her improper statements and behavior.

• The prosecutor provided the court with a factually plausible basis for her first improper argument; however, she failed to address her second improper statement and inappropriate conduct.

• The court does not believe Ms. Johnson's statements to the jury were made in the heat of battle or were the result of Ms. Johnson having a momentary lapse in judgment.

• Ms. Johnson's conduct was designed to force the Defense to ask the Court to order a mistrial rather than allow the case to go to the jury and risk a judgment of acquittal.

• The tone and inflection of Ms. Johnson's argument intimated that the complainant was victimized because he was African American or that the defendant thought the complainant was "less than" (sic) because the complainant was African American.

• The defendant testified on his own behalf and provided a detailed account of his time and actions on the day in question.

• After a long and difficult two-week jury trial, Prosecutor Johnson, intentionally engaged in conduct designed to force the court to grant a mistrial of this case.

## A. The State's comments merited objection.

While conceding that the prosecutor's second comment, "You see what [the complainant's] up against?" was inappropriate, the State argues that the prosecutor

17

could not have intended to solicit a mistrial because her first line of argument was a proper response to the defendant "chastising" the complainant's home life. The State also argues that appellee injected race into the proceedings, and the prosecutor's argument was an appropriate response.

While the State was entitled to respond to appellee's testimony about why he placed orders to have a social worker evaluate the complainant's home life, the trial court found that the prosecutor implied the complainant's race "was a factor in his victimization." *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 309 n.30, 107 S.Ct. 1756, 1770 n. 30, 95 L.Ed.2d 262 (1987) (noting that the United States Constitution prohibits racially biased prosecutorial arguments). Reviewing the record, we cannot say that the trial court's findings are not supported. Appellee testified that there was a medical reason the complainant should not be on Albuterol—namely that its use was associated with heart arrhythmias and could be dangerous.

But, even if the prosecutor's initial argument had been proper, the State concedes that the comment that led to the mistrial was improper. *See Stahl v. State*, 749 S.W.2d 826, 828–32 (Tex. Crim. App. 1988) (holding references to outburst constituted harmful error). The prosecutor made this comment immediately after the trial court sustained an objection to the prosecutor's arguments. The trial court found that the prosecutor made sidebar comments in front of the jury, displaying open and obvious contempt for the trial court's rulings and that the prosecutor impugned the dignity of the court. Affiants providing statements in the habeas record stated that the sidebar comments were a more direct statement that either appellee or defense counsel is racist. The next statement the prosecutor made, "You see what [the complainant's] up against?" came with an arm gesture that the trial court found suggested the trial court was

18

biased against the complainant. This escalation came on the heels of a sustained objection and an admonition from the trial court to "disregard the last comment by the prosecutor."

The trial court found that the prosecutor was an experienced attorney who knew, before she made the final comment, that the comment was improper and that the defense would have to object and ask for a mistrial to preserve error. Given the events that had just transpired, the record supports the conclusion that the prosecutor knew her comment was improper and that the defendant's objection likely would be sustained. Even if the prosecutor's initial commentary had been appropriate, the record supports the trial court's finding that the prosecutor knew, when she made the second comment, that the remark was improper, that the trial court would sustain the objection, and that appellee would be forced to request a mistrial to preserve error. *See Ex parte Masonheimer*, 220 S.W.3d at 506.

**B. The record supports the trial court's findings.**

The State argues that the trial court improperly relied on a pattern of conduct that included actions taken by the other prosecutor to support the trial court's findings. In particular, the State argues that the record does not contain legally sufficient evidence to support the trial court's twenty-eighth, thirty-fourth, and eighty-first findings of fact. The trial court's twenty-eighth finding is "[i]n the face of an impending judgment of acquittal, the timing of Ms. Johnson's improper conduct demonstrates her intent to force the Court to order a mistrial . . . ." The trial court's thirty-fourth finding is "Ms. Johnson's behavior was designed to force the Defense to ask the Court to order a mistrial rather than allow the case to go to the jury and risk a judgment of acquittal," and the trial court's eighty-first finding is after a long and difficult two week jury trial, the prosecutor "intentionally engaged in conduct designed to force the Court to grant a mistrial in this case."

19

These findings address the prosecutor's state of mind. Keeping in mind that appellate judges might not reach the same conclusion on a cold record that one might reach if one had been sitting as a trial judge, we must consider whether the trial court's finding is supported by the record. *See Ex parte Wheeler*, 203 S.W.3d at 324. Thus, we now assess the trial court's ruling in light of the *Wheeler* factors.

### 1. Was the misconduct an attempt to abort a trial that was going badly for the State?

We must consider whether, at the time the prosecutor acted, it reasonably appeared that the defendant likely would obtain an acquittal. The trial court made findings that the State called witnesses who had accompanied appellee on hospital rounds the day of the alleged incident and those witnesses believed appellee had not committed the offense. The trial court found that presenting these witnesses was damaging to the State's theory of the case. The trial court also found that appellee testified, denied committing the offense, and provided a detailed account of his time and actions on the day in question. These findings are supported by the record.

The State's primary witness, the complainant, was consistent in testifying that appellee came into his hospital room only one time and did not perform a medical exam. Appellee and two residents testified that appellee performed a normal medical exam on the complainant during rounds. Appellee presented expert testimony that the complainant inadvertently could have come to testify that appellee touched him inappropriately after having been asked leading questions over and over by well-meaning adults. Furthermore, appellee presented evidence that the complainant's injuries were inconsistent with the alleged misconduct and that the injuries did not occur until after the complainant left the hospital.

The aunt told the police that the complainant was unaccompanied in his

20

hospital room from 7:00 a.m. until 9:00 a.m. The record established appellee did not enter the complainant's room during that timeframe except during rounds, when he was accompanied by a team of residents. In closing arguments, the prosecutor argued that appellee entered the complainant's room a second time, contrary to the complainant's testimony, between 9:30 a.m. and 10:03 a.m., a time the aunt told police she was present in the room. Several witnesses testified that appellee would not have been able to sneak into the complainant's room during rounds and appellee presented evidence that he saw the sixth patient out of fifteen at 9:10 a.m. Several witnesses testified that the fastest they could round on a patient would be about five minutes. This evidence supported appellee's testimony that he did not go back into the complainant's room between rounds and entering patient notes on the computer.

The State did not provide a significant challenge to appellee's evidence about where he was at different points in time on the morning of the alleged incident. Instead, the State attempted to impugn appellee's character, asking impermissible questions that violated an order in limine and attempting to paint appellee as arrogant and self-important. Although the prosecutor filed an affidavit stating that she did not think trial was going poorly, her closing argument suggested that the complainant and the State faced an uphill battle in securing a conviction. The "David vs. Goliath" theme of the prosecutor's closing argument provides some insight into her mental state at that point in trial.

The juror affidavits confirm that those jurors felt the trial was going poorly for the State. One juror recounted that an informal straw poll after the mistrial showed thirteen of the fourteen jurors thought appellee was not guilty, with one juror undecided, but leaning toward a "not guilty" vote. More importantly, the jurors were not nuanced in their view of the trial. They were critical of the

prosecutor's tactics.  One called the trial a farce.

## 2. Was the misconduct repeated despite the trial court's admonitions?

The trial court found that it properly admonished the prosecutor after the prosecutor made her initial commentary.  But, the trial court found that instead of complying with the trial court's order, the prosecutor intentionally and inappropriately complained to the jury about the court and the audience.  The prosecutor made a comment that the trial court found showed the prosecutor believed the defense and the audience were biased against the complainant.  Then, after the trial court's warning, the prosecutor made another statement to the same effect, implying that the trial court's ruling on the prosecutor's initial comment demonstrated the truth of the first remark.

## 3. Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

The trial court found that the prosecutor did not provide a credible explanation for her improper behavior.  The prosecutor submitted an affidavit in which she stated that the theme of her closing was "David v. Goliath," the nine-year-old complainant versus the well-respected and accomplished pediatrician.  The prosecutor pointed out that the defense had presented evidence that the complainant's mother falsely accused appellee in an attempt to get money from Memorial Hermann Hospital.  Additionally, the defense had presented evidence that provided an unflattering portrait of the complainant's family.  The prosecutor noted that the defendant had called the complainant's account and history "sketchy" and stated that "socially, it was, you know, a mess."  The prosecutor stated that during direct examination, appellee made statements and judgments about the complainant's home life.  The prosecutor stated that she believed the defense attempted to place the complainant's family in a bad light to show they were not credible witnesses.  The prosecutor explained that she was summarizing

22

appellee's testimony concerning the complainant's medication regime and that appellee testified the complainant was not being taken care of correctly because African American children should not be on Albuterol.

Although different individuals could view the prosecutor's affidavit differently, as the finder of fact, the trial court was entitled to discredit the prosecutor's affidavit statements.

### 4. *Was the conduct "clearly erroneous"?*

The State argues that the prosecutor's commentary on appellee's testimony about the complainant's family was permissible, but the State acknowledges that the prosecutor's follow-up "you see what he's up against" statement was impermissible. *See Stahl*, 749 S.W.2d at 828–32.

### 5. *Was there a legally or factually plausible basis for the conduct despite its impropriety?*

The trial court found that the prosecutor gave a legally or factually plausible basis for the commentary on appellee's testimony about the complainant's family, but the prosecutor failed to address her second improper statement and improper conduct. In her affidavit, the prosecutor stated that her second improper statement was an argument to further her theme of "David v. Goliath." But not all statements that could further a particular theme are permissible arguments, so even if the statement expounded on the prosecutor's theme, that does not explain why the prosecutor thought the statement had a legally or factually plausible basis.

### 6. *Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they intentional?*

The trial court found that the prosecutor's actions were intentional. Although different people might reach different conclusions about the prosecutor's intent, the trial court's determination that the prosecutor's actions were intentional

is supported by the record. The record shows that after the prosecutor's first improper statement, the jurors looked shocked. The habeas record contains evidence that the jurors had their mouths agape and appeared stunned. Furthermore, immediately after the trial court sustained an objection, the prosecutor re-engaged in making the same type of statement.

After analyzing the trial court's findings in light of the non-exclusive factors the Court of Criminal Appeals has suggested the trial court might consider in determining the prosecutor's intent, we conclude the trial court's findings are supported by sufficient evidence. *See Ex parte Wheeler*, 203 S.W.3d at 323–24; *Ex parte Masonheimer*, 220 S.W.3d at 506.

### C. The trial court's findings support its conclusion.

The State argues that the trial court's findings do not support its conclusion that jeopardy should attach to appellee's current trial because the trial court made conclusions that the State intentionally and deliberately engaged in an inappropriate pattern of conduct so as to force defense counsel to move for mistrial. The State argues that some of the trial court's fact findings related to the pattern of conduct are not evidence of the prosecutor's intent to goad defense counsel into moving for a mistrial to avoid an acquittal. Many of the findings the State references bear on the way trial was progressing and how the prosecutor may have felt about the outcome. For example, one inference the trial court could have drawn from behavior that the trial court found was improper is that the State resorted to those tactics in light of a difficult trial. But, even if some of the trial court's findings are extraneous, the trial court made sufficient findings to support its conclusion that jeopardy should attach.

Jeopardy should attach if the prosecutor's actions giving rise to the motion for mistrial were done "to goad the defendant into requesting a mistrial." *Oregon*,

456 U.S. at 672–73, 102 S.Ct. at 2088. The trial court made specific findings that trial was going poorly for the State and those findings support an inference that the prosecutor was aware trial was going poorly for the State and appellee might be acquitted. The trial court made findings that the prosecutor's conduct was intentional. The trial court found that as an experienced criminal attorney, the prosecutor knew her conduct was improper before she committed it and also knew that appellee would have to request a mistrial to preserve error on any complaint about the conduct. Moreover, the conduct came on the heels of other improper behavior that led to a sustained objection and a jury instruction. The first improper conduct caused a reaction in the courtroom and the habeas record suggests the jurors were shocked by the prosecutor's behavior. The prosecutor saw the jurors' reactions to her first improper argument, and although the prosecutor stated that she did not feel the trial was going poorly, the trial court could have discounted that statement, particularly in light of the trial record. The trial judge was present throughout the two-week trial and she was in the best position to evaluate the prosecutor's intent.

After reviewing the record and considering the non-exclusive factors the Court of Criminal Appeals has suggested may help a trial court determine a prosecutor's intent, we conclude that the trial court did not abuse its discretion in granting appellee's request for pretrial habeas-corpus relief. *See Ex parte Masonheimer*, 220 S.W.3d at 506. Therefore, we overrule the state's sole issue and affirm the trial court's order.

/s/ Kem Thompson Frost
   Chief Justice

Panel consists of Chief Justice Frost and Justices Boyce and Brown.
Publish — TEX. R. APP. P. 47.2(b).