

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-24-00290-CR

**EX PARTE** Guadalupe **CONTRERAS**

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CR4792
Honorable Ron Rangel, Judge Presiding

Opinion by:    Adrian A. Spears II, Justice

Sitting:        Irene Rios, Justice
                Adrian A. Spears II, Justice
                H. Todd McCray, Justice

Delivered and Filed: February 26, 2025

AFFIRMED

Guadalupe Contreras is presently charged by indictment with murder. On June 26, 2023, his first trial ended with the trial court granting his motion for mistrial. Contreras then filed an application for writ of habeas corpus, alleging that double jeopardy barred further prosecution. After an evidentiary hearing on the merits, the trial court denied Contreras's requested relief. Contreras then filed this appeal, arguing that the trial court erred in denying his requested relief. We affirm.

## BACKGROUND

Contreras was indicted for the murder of his estranged wife, Elizabeth Contreras. At trial, there was evidence that on August 2, 2017, Elizabeth told her ex-husband and father of her

daughter, Joe Munoz, that she was going to one of her jobs to check her work schedule. She never returned, and her body was found five days later in a tree-lined area in a state of decomposition.

During cross-examination, forensic analyst Robert Sailors testified about a forensic DNA report in which he reviewed fingernail clippings. Defense counsel complained that he had not been given the report by the prosecution. Sailors testified that they "were under a different SAPD case number and CIL case number." The prosecution quickly questioned Sailors on voir dire outside the presence of the jury:

> Q: Robert, like your office submitted to our office what's called a discovery packet. Is that right? We have a discovery packet that's a part of our materials, like a 480-something page document. Would that be in the discovery materials you're talking about?
> A: I would hope so. So, when we issue discovery packets, they are by CIL case number. So, if I was not aware of the connection at the time of this case number to the case, then a discovery packet may not have been issued on this one.
> Q: Okay. So, for example, I'm looking—if this information has been in discovery, it's a discovery packet that was requested back in 2018, what would I look for in the discovery packet to know whether what you're talking about is there?
> A: So, if you have the discovery packet for CIL case number 17-05412, it should be in that one.
> Q: So, I have 17-05260. What's the other one you said?
> A: 17-05412.

After an off-the-record discussion, defense counsel was given an opportunity to "put on the record what's going on." Defense counsel complained that on day five of testimony in the case, he had been given a second report for the first time, which impaired his ability to prepare a defense for his client and violated his client's constitutional rights. The prosecution again questioned Sailors on voir dire, asking if he had an explanation why there were "two different CIL numbers." Sailors replied that there were "different CIL numbers because they have different SAPD numbers," but he did not know why there were two different numbers. Sailors testified that discovery packets are compiled by CIL number and that the main CIL number in the present case was 17-05260. The trial court continued trial to mid-morning Monday so that Sailors could give the discovery packet

to the prosecution, which in turn could give the discovery packet to the defense. When trial reconvened on Monday, the prosecution made the following proffer outside the jury's presence:

> Friday afternoon the record will reflect that there was a newly-discovered forensic DNA report done by Robert Sailors. That report was new to the State as of Friday, obviously new to the defense as of Friday. And while the report had been a part of the crime lab documents since 2018, it was filed under a different CIL number. The CIL number that it was filed under was 17-05412.
>
> When the State was working with Mr. Sailors in pretrials, working with him about the work that he had done, we had all been working under the—now we know the wrong assumption, but the assumption that the only CIL case number with regard to Mr. Sailors's work was 17-05260. It wasn't until Friday when we were discussing Crystina Vachon's work that she had the fingernails and that the known sample from Elizabeth was filed under a different CIL case number that Mr. Sailors clued in, "Hey, there is a different CIL number," pulled up his notes, and that's when we discovered that he did, in fact, have a different—he did do a separate forensic DNA report that we had not been previously made aware of.
>
> Once we were made aware of that, we discovered this SAPD case number that now we are finding out is in different places in the prosecution guide, but this new SAPD case number—I'm going to say newly-discovered number—17-174655, is what caused this separate generation—the separate creation of this different CIL case number.
>
> So, with that different SAPD case number previously, . . . the State had been working under a missing person's case number and a homicide case number, where this SAPD case number, 17-174655, was for some reason attached to what's called an apparent sudden death incident case, not attached to our missing persons, not attached to our homicide.
>
> As a result of that, there are two one-page police reports that are with regard to the apparent sudden death incident. We are able to pull those two reports. We have turned those over to [the defense], but over the weekend, what we realized is [that] under this report, there were aerial photos and a video of the scene that was taken under this separate [apparent] sudden death . . . SAPD case number.
>
> We got in touch with Homicide. We asked if they could please locate the aerial photos and locate the video of the scene. But because this was filed as an apparent sudden death under the separate case number and was never attached to our homicide or our missing persons, it was purged after two years per SAPD's retention standard operating procedures.
>
> So, no bad faith on SAPD's part, just that it was not coded as a murder so it wasn't coded to be kept beyond two years. And the aerial photos and the videos of the

scene have been purged, so we are unable to turn that over. They are not in the possession of SAPD anymore.

And obviously the only thing we have with regard to that apparent sudden death is the two one-page reports in addition to the two-page forensic DNA report for Mr. Sailors, and then I think it was roughly a 90-ish, 93-page, discovery packet that was under that separate CIL case number ending in 05412.

The prosecution then argued that the forensic DNA report merely showed that the fingernail clippings had Elizabeth's DNA on them. Further, the prosecution argued there was another video taken on the crime scene that had been part of the discovery given to the defense. The prosecution emphasized that the spoliation of the evidence had not been done in bad faith.

In response, defense counsel pointed out that the prosecution guide from the detective contained the SAPD case number in question and thus argued that the detective must have known about this other number. Defense counsel further argued the aerial video was different from the video preserved and would have shown possible muddy spots or tire tracks. Defense counsel stressed that he had discussed with the medical examiner the possibility of the body being moved to the location where it was found from another location. According to defense counsel, "Well, perhaps there is a game trail or something like that visible from the aerial photos that are not visible from the ground photos that [the defense] could have used to say, for example, this is a clear animal trail, or you know, trail where animals use; could the body have been dragged along this trail?" Defense counsel continued, "But, once again, I can't because I didn't know evidence existed." Defense counsel argued that the only "remedy for destruction of evidence is mistrial with prejudice." The trial court partially granted defense counsel's request by granting a mistrial without prejudice. The trial court found that there was no bad faith on the part of the State.

Contreras then filed a pretrial application for writ of habeas corpus in the trial court, arguing that any subsequent trial was barred by double jeopardy under both the United States and Texas

Constitutions. At the evidentiary hearing on the merits of the application, defense counsel and Detective Juan Espinoza testified. Defense counsel testified that it was only at the end of the State's case that he learned he had never been given evidence, like the aerial video from the police helicopter, which had been subsequently deleted. Defense counsel testified the aerial video had been attached to an apparent sudden death case number and had not been linked to Elizabeth's homicide case. Defense counsel testified that had he been given the aerial video, he might have been able to show the jury "an alternative version of the story." Defense counsel testified that he moved for a mistrial only because he "had no choice." Defense counsel blamed the homicide detective for failing to retain the video footage, noting that the apparent sudden death case number was contained "in his prosecution guide." Defense counsel argued not retaining the footage was "100 precent bad faith."

Detective Espinoza testified he was the lead investigator from SAPD's Homicide Unit assigned to Elizabeth's case. He testified an apparent sudden death report occurs when a body is found. According to Espinoza, at the time Elizabeth's body was found, the police did not know that the body was Elizabeth. Her body was identified through dental records. Espinoza testified that it was the responsibility of the police helicopter pilot to properly tag the videos taken. Espinoza testified that when video footage is tagged, it is retained for a certain period of time depending on its classification. The video footage in this case was not tagged as being part of a homicide investigation. Espinoza testified the video footage was tagged as apparent sudden death and was given the "default" classification of administrative, which led to it being overwritten. Espinoza testified that he did not intentionally destroy or purge the information in question and only learned it existed during Contreras's trial.

On cross-examination, Espinoza agreed that when he generated his prosecution guide, he knew that case number 17-174655, the apparent sudden death case number, existed and was connected to the discovery of Elizabeth's body. However, according to Espinoza, "on the offense report for the apparent sudden death, there is no mention of [the police helicopter] being out there [at the crime scene]." Espinoza testified he "learned later under the key card [that] there was a note saying that [the police helicopter] was out there." When asked why he had not read the "key card,"[1] Espinoza replied, "I just didn't read it."

Espinoza testified that "either Sergeant Evans or [Detective] Rich Richardson" added notes to the key card. One of the notes stated that "the Eagle [police helicopter] pilot arrived at location, took aerial photos and video, nothing else needed." Espinoza testified he had not read this note when making his prosecution guide but that when he saw the crime scene photos, he discussed them with Sergeant Evans. According to Espinoza, Sergeant Evans did not mention that the police helicopter had been at the scene. Espinoza agreed with the defense that at the time he was preparing his prosecution guide, he knew the apparent sudden death case number was related to Elizabeth's body:

> Q: [A]t that time, had you requested the reports and the key card, you would have known about [the police helicopter], because it's listed in the key card that they were there, correct?
> A: Right, if I had looked at the key card, I would have seen that the—
> Q: And at the time you worked on your detective's report, your prosecution guide, it had not yet been destroyed?
> A: My understanding, no.

After hearing the evidence from defense counsel and Detective Espinoza, the trial court denied Contreras's requested relief. This appeal followed.

---

[1]A "key card" is an Incident Detail Report. Espinoza testified the dispatcher puts the information into the key card or Incident Detail Report. Espinoza testified officers can only "add notes to the key card."

**HABEAS AND STANDARD OF REVIEW**

A habeas applicant has the burden to prove his allegations by a preponderance of the evidence. *Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, no pet.). Thus, he "has the burden to bring before the court a record sufficient to prove his allegations." *Id*. "In a habeas proceeding, the trial court may take judicial notice of earlier proceedings before the same judge and involving the same parties." *Id*. Accordingly, "[a]ppellate review of the court's ruling is not limited to the evidence adduced at the habeas hearing, but may include the record as it existed before the trial court at the time of the hearing." *Id*.

We review a trial court's decision to grant or deny relief requested in a habeas application based on double jeopardy for an abuse of discretion. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006); *Ex parte Martinez*, 560 S.W.3d 681, 695 (Tex. App.—San Antonio 2018, pet. ref'd). Under this standard, we "review the record evidence in the light most favorable to the trial court's ruling," affording great deference to the trial court's findings and conclusions, especially when they involve credibility and demeanor determinations. *Martinez*, 560 S.W.3d at 695 (quoting *Kniatt*, 206 S.W.3d at 664). "The mere fact that we might decide the matter differently is insufficient to constitute an abuse of discretion; rather, to overturn the habeas court's ruling on a petition for writ of habeas corpus, we must find the ruling was outside the zone of reasonable disagreement." *Id*.

**DOUBLE JEOPARDY AND HABEAS RELIEF**

On appeal, Contreras argues that the trial court erred in denying him relief because "the prosecution team provoked a mistrial" and "intentionally failed to disclose exculpatory evidence with the intent to avoid the possibility of an acquittal" in violation of the United States and Texas Constitutions. "The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). However, the Supreme Court has recognized that when "a mistrial [is] declared at the behest of the defendant, quite different principles come into play." *Id*. at 672. "A defendant's motion for a mistrial constitutes a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *Id*. at 676 (citations omitted). Thus, as a general rule, a defendant moving for mistrial prevents him from raising double jeopardy. *See id*. Yet, in *Oregon v. Kennedy*, the Court provided for a limited exception to this general rule—when "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id*. at 679.

The Court emphasized that this exception to the general rule was a "narrow" one. *Id*. at 673. It is not sufficient that the prosecutorial conduct is viewed as "harassment or overreaching." *Id*. at 675. Such prosecutorial conduct "does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id*. at 675-76. Thus, where a defendant has moved for mistrial, the double jeopardy bar applies "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial." *Id*. at 676.

In *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007), the Texas Court of Criminal Appeals adopted this federal standard announced in *Oregon v. Kennedy* for review of

double jeopardy claims under the Texas Constitution after a mistrial based on prosecutorial misconduct. Accordingly, whether a claim is made under the United States Constitution or the Texas Constitution, a reviewing court must determine whether a defendant successfully moved for a mistrial because the prosecutor "engaged in conduct that was 'intended to provoke the defendant into moving for a mistrial.'" *Ex parte Lewis*, 219 S.W.3d at 336 (quoting *Oregon*, 456 U.S. at 679). Thus, we address Contreras's arguments as to his double jeopardy rights under the United States and Texas Constitutions together.

In *Ex parte Masonheimer*, 220 S.W.3d 494, 495 (Tex. Crim. App. 2007), the court of criminal appeals subsequently discussed the *Oregon v. Kennedy* standard in the context of when a defendant requested a mistrial because the prosecution failed to produce *Brady* material. In *Masonheimer*, the trial court granted relief on the applicant's pretrial application for a writ of habeas corpus, which claimed double jeopardy barred a third trial. *Id*. at 503. However, the court made no finding as to whether the prosecutor intended to provoke a mistrial. *Id*. In reviewing the evidence in the light most favorable to the trial court's ruling, the court of criminal appeals affirmed the trial court. *Id*. at 506, 508-09. In doing so, the court of criminal appeals did not rely on the express holding in *Oregon v. Kennedy* that an applicant must demonstrate that the prosecutor engaged in conduct with intent to provoke the defense in moving for a mistrial. Instead, the court examined cases that were cited with approval in *Oregon v. Kennedy* in which relief had been granted because the prosecution had acted with intent to avoid a probable acquittal. *See Ex parte Masonheimer*, 220 S.W.3d at 507-08. The court explained,

> Keeping in mind that we are required to view the evidence in the light most favorable to the trial court's ruling that prosecuting appellee a third time is jeopardy-barred, we are constrained to decide that the extensive portions of the record set out in this opinion support a finding that appellee's mistrial motions were necessitated primarily by the State's "intentional" failure to disclose exculpatory evidence that was available prior to appellee's first trial *with the specific intent to*

*avoid the possibility of an acquittal*. Under *Oregon v. Kennedy*, this deliberate conduct, accompanied by this specific mens rea, bars a retrial.

*Id.* (emphasis added). "Thus, in Texas, when a defendant moves for a mistrial and subsequently claims retrial is barred by double jeopardy, the habeas court, and all subsequent reviewing courts, must determine whether: (1) the prosecutor engaged in conduct to goad or provoke the defense into requesting a mistrial; or (2) the prosecutor deliberately engaged in the conduct at issue with the intent to avoid an acquittal." *Martinez*, 560 S.W.3d at 697.

In *Ex parte Wheeler*, 203 S.W.3d 317, 323 (Tex. Crim. App. 2006), the court of criminal appeals noted that "culpable intent" "is not always easy to discern" in the "adversarial 'rough and tumble' [context] of a hotly contested trial conducted by zealous advocates," which can result "in much unplanned, inadvertent, or impulsive rule-violating." The court recognized that "subjective intent" "may often be unknowable." *Id.* Thus, the court "set out a list of non-exclusive objective factors to assist trial and reviewing courts in assessing the prosecutor's state of mind," which include the following:

1) Was the misconduct a reaction to abort a trial that was "going badly for the State?" In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?
2) Was the misconduct repeated despite admonitions from the trial court?
3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?
4) Was the conduct "clearly erroneous"?
5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?
6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with . . . intentional misconduct?[2]

---

[2]The court of criminal appeals in *Ex parte Wheeler*, 203 S.W.3d at 323-24, referred to "reckless or intentional misconduct." However, the court subsequently clarified *Ex parte Wheeler*, explaining that double jeopardy arises only if the misconduct of the members comprising the prosecution team *intentionally* goaded or provoked the defendant's attorney into making a request for a mistrial. *See Ex parte Lewis*, 219 S.W.3d at 336-37, 371; *see also Ex parte Martinez*, 560 S.W.3d at 697 (applying *Wheeler* factors in review of pretrial habeas based on double jeopardy). We note that the State argues in its brief that *Ex parte Lewis* "implicitly overruled" application of the *Wheeler* factors. We disagree with the State and conclude that *Ex parte Lewis* merely affected the *Wheeler* factors as to a determination that the prosecutor acted recklessly and not as to a determination that the prosecutor acted intentionally. We emphasize

*Id*. at 323-24.

In denying Contreras's requested relief, the trial court made findings with respect to the above factors. First, the trial court found that the prosecutors (1) had not engaged in conduct to goad or provoke the defense into requesting a mistrial and (2) had not deliberately engaged in the conduct at issue with the intent to avoid an acquittal. According to the trial court, "[a]t the time that the prosecutors turned over the DNA-related evidence to the defense, it did not reasonably appear that the trial was going poorly for the State or that [Contreras] would likely obtain an acquittal." The trial court further found that "[b]oth sides became aware of this new evidence for the first time during the first trial of this case" and that the "evidence was turned over to the defense as soon as the prosecutors became aware of it." Thus, as to the second factor, there were no repeated acts of misconduct by the prosecutors despite admonitions from the trial court. Third, the trial court found that the prosecutor had "provided a 'good faith' explanation for all of the alleged misconduct." Fourth, the trial court found that the "conduct complained of was not 'clearly erroneous.'" Fifth, the trial court found there was a plausible basis for the alleged misconduct. Sixth, the trial court found that the "prosecutor's actions leading up to the mistrial were *not* consistent with intentional or reckless misconduct." (emphasis in original). Finally, the trial court found that there was "no bad faith on the part of the State or on the part of law enforcement regarding the confusion over there being evidence filed with two different case file numbers," and there was "no bad faith with regard to the failure to preserve the Eagle [police helicopter] video."

---

that many of our sister courts have applied the *Wheeler* factors after *Ex parte Lewis*. *See Ex parte Gilbert*, No. 12-22-00288-CR, 2023 WL 3033213, at *3-4 (Tex. App.—Tyler Apr. 20, 2023, no pet.) (applying *Wheeler* factor in pretrial habeas proceeding based on double jeopardy); *State v. Rushing*, No. 09-16-00423-CR, 2017 WL 4182316, at *6 (Tex. App.—Beaumont Sept. 20, 2017, pet. ref'd); *State v. Yetman*, 516 S.W.3d 33, 36-37 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (same); *Ex parte Roberson*, 455 S.W.3d 257, 260 (Tex. App.—Fort Worth 2015, pet. ref'd) (same);

The trial court found that "plausible explanations were given for such occurrences, and such action was not due to intentional or reckless misconduct."

As noted, under our standard of review, we review the evidence in the record in the light most favorable to trial court's ruling, "afford[ing] great deference" to the trial court's findings and conclusions, especially when "they involve determinations of credibility and demeanor." *Martinez*, 560 S.W.3d at 695. When viewed in the light most favorable to the trial court's ruling, the evidence supports the trial court's findings that (1) the defense had not been goaded or provoked into requesting a mistrial, and (2) the prosecution had not deliberately engaged in the conduct at issue with the intent to avoid an acquittal. *See Martinez*, 560 S.W.3d at 697. Thus, we hold the trial court did not abuse its discretion in determining that double jeopardy did not bar a subsequent prosecution of Contreras for Elizabeth's murder. Accordingly, we affirm the trial court's order denying Contreras's requested relief.

Adrian A. Spears II, Justice

PUBLISH